# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE

_____

| | |
|---|---|
| IN THE MATTER OF I.L., A minor Student, By and Through Her Parent, D.T.,and D.T., Individually, | ) ) ) ) ) |
| **Plaintiffs.** | ) ) |
| vs. | ) No. 3:15-cv-00558 ) District Judge Reeves ) ) ) |
| KNOX COUNTY BOARD OF EDUCATION, AND KNOX COUNTY; | ) ) ) |
| KELTON SWEET, individually; CLOVIS STAIR, individually; ROBBIE NORMAN, individually; | ) ) ) ) |
| and | ) ) |
| TENNESSEE DEPARTMENT OF EDUCATION | ) ) ) |
| **Defendants.** | ) |

_____

## SECOND AMENDED COMPLAINT

**COME THE PLAINTIFFS**, I.L., a minor, by and through her mother, D.T., and

D.T., individually,  through counsel, filing this Second Amended Complaint.  They show:

1

# I. PARTIES, JURISDICTION AND VENUE

1.     I.L. is the minor child with a disability of Down syndrome. Her parent is D.T. They reside in Knox County, Tennessee. They are citizens of the United States.

2.     Tennessee Department of Education is the "State Education Agency" (SEA) which is legally responsible for ensuring that a free appropriate education (FAPE) is provided to all students in the state of Tennessee. An "SEA" includes a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, township, school district, or other political subdivision of a State [.]" 20 U.S.C. §1412(a)(1).

3.     TDOE accepts federal funding and has for decades. TDOE is bound by the IDEA, by Section 504, and by Title II of the Americans with Disabilities Act.

4.     Knox County Board of Education and Knox County are governmental subdivisions of the State of Tennessee, duly authorized to administer public schools within Knox County. It receives federal financial assistance and is a public entity as defined in Title II of the Americans with Disabilities Act, and is obligated under Federal and Tennessee law to comply with special education laws, which provide behavioral supports to children with disabilities. Hereafter, these defendants are jointly referred to as "KCS."

5.     The Defendants, Kelton Sweet, Clovis Stair, and Robbie Norman are individuals employed by KCS, who all reside in Knox County. Suit is being brought against them in their individual capacities. Kelton Sweet is a Behavioral Consultant. Clovis Stair is a Special Education Supervisor and Psychologist. Robbie Normal is a Principal. All owed duties of care to I.L.

6.     Jurisdiction is proper because this is an action for Judicial Review pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1415(e)(2), *et. seq.*, and Tennessee Code Annotated §4-5-322. A due process final order was entered by the State's Administrative Procedures division on November 6, 2015. This matter was timely appealed within the requisite sixty (60) days. Additionally, jurisdiction is proper under the IDEA and its state counterpart, Tenn Comp. R. & Reg § 0520-01-09; Title II of the Americans with Disabilities Act, 42 U.S.C. §12101 *et. seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794; and the First Amendment to the United States Constitution and 42 U.S.C. §1983. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

7.     Venue is proper under 28 U.S.C. §1391 because the alleged acts in this lawsuit occurred in this judicial district and/or because the Defendant conducts business in this judicial district or "reside" in this judicial district.

## II.     FACTS

### A.     DISABILITY COVERAGE

8.     At times relevant hereto, I.L. was a 10 year old child with Down syndrome. Down syndrome is an intellectual disability caused by an additional chromosome. I.L. requires specialized instruction and she enjoyed an Individualized Education Plan (IEP) under the IDEA. I.L. is eligible under IDEA.

9.     I.L. is also an individual with a "disability" under Section 504 and Title II of the ADA due to the medical impairment of Down syndrome, a chromosomal abnormality which affects, *inter alia*, her major life activities of thinking, learning, communicating, and perceiving. Thus, she is dual covered under IDEA and Section 504 and Title II.

## B. 3ʳᴰ GRADE: I.L. SEEKS INCLUSION IN REGULAR CLASSROOM

10.     For many years, I.L. tried to become included ("mainstreamed") within the regular education environment in Tennessee schools. For years, she was turned away, beginning in preschool where KCS took the position that regular education with supplemental aids and services is "more restrictive," not "less restrictive," than a separate classroom.

11.     By third grade, I.L. departed what was known as the Tennessee Virtual Academy in the hope of being integrated with non-disabled peers. Equipped with an IEP developed by the Virtual Academy, she enrolled at West Hills Elementary in Knoxville for third grade. West Hills Elementary elected to adopt it in full.

12.      Once at West Hills, the classroom teacher proceeded to teach I.L. without regard to the IEP goals. She apparently did not realize it was adopted, admitting she knew none of the goals.

13.     Without implementation of the IEP, I.L.'s mother attempted a fresh start for I.L. by moving her to a different elementary school: Brickey McCloud. At this point, KCS demanded that I.L. be placed in a segregated class for more than 50% of the day, including four hours per day without access to non-disabled peers. This demand occurred *before* I.L.'s IEP had been attempted and *without* a completed Functional Behavior Assessment or a Behavior Improvement Plan.

### B.1. Behavior and Lack of Positive Behavior Intervention

14.     The demand for a more restrictive environment was premised by KCS largely upon I.L's behavior—even though she did not have a Behavior Improvement plan (BIP) or a completed FBA.

15. I.L. was clearly entitled to appropriate behavioral supports to succeed in the regular education classroom in order to have an equal access to education. Plaintiffs' expert, Dr. Julie Causton at Syracuse University, testified that IL required appropriate behavioral supports. Similarly, Defendant's expert, Dr. David Rostetter, testified that I.L. required appropriate behavioral supports. In fact, without them, Dr. Rostetter testified she did not even have a full IEP. The state hearing officer, too, found that I.L. was entitled to appropriate behavioral supports. The hearing officer awarded behavioral supports should be implemented as part of the remedy.

16. Indeed, behavioral supports are critical for many children with Down syndrome.

17. For example, per the record evidence from the National Down Syndrome Society, *common* behavioral challenges for many kids with Down syndrome include: "wandering / running off," "stubborn / oppositional behavior," "attention problems," and "obsessive / compulsive behaviors." *NDSS: Managing Behavior: What Are Some Behavioral Challenges Typical in Persons with Down Syndrome?*

18. Behavioral supports are critical for many children with Down syndrome. Per the record evidence from the National Down Syndrome Society, *common* behavioral challenges for many kids with Down syndrome include: "wandering / running off," "stubborn / oppositional behavior," "attention problems," and "obsessive / compulsive behaviors." *NDSS: Managing Behavior: What Are Some Behavioral Challenges Typical in Persons with Down Syndrome?*

19. While all stakeholders agreed that I.L. needed behavioral interventions, KCS nevertheless made the decision for a more restrictive environment before affording them to I.L. Thus, KCS used I.L.'s disability-conduct *as the basis* for a more restrictive

environment without first providing her the supports she needed (under IDEA) or the accommodation she needed (under 504 and ADA).

20.      The ALJ rewarded KCS, finding that the change to more restrictive placement was appropriate based upon maladaptive behaviors, notwithstanding KCS not providing a BIP.  That was error requiring reversal.

21.      Considering I.L., by all accounts, could perform academic goals revised by the IEP Team, it was the *behavioral supports* (accommodations) which would allow IL equal access to a regular education curriculum like her non-disabled peers. As a young child with Down syndrome, IL cannot "cure herself"--she requires, and is legally entitled to, the supports being put in place by the adults.

22.      At no time did Plaintiffs challenge the *existence* of all maladaptive behavior.  To the contrary, Plaintiffs challenged the lack of *behavioral supports* from adults to address maladaptive behavior.  I.L. was *never* afforded a Behavior Intervention Plan as a support. Thus, she never had a completed IEP.

### B2. The "Clowning Strategy" With "Zero Chance" of Working

23.      Moreover, the behavioral "strategies" by KCS in lieu of a Behavior Intervention Plan are wildly inconsistent with the needs of a child with Down syndrome, and I.L., in particular.

24.      KCS utilized a Behavioral Consultant, Defendant Kelton Sweet, who admittedly had no experience with Down syndrome.  KCS, through Sweet's recommendations, used strategies of "hyping," "ramping," and "clowning" I.L. in order to distract her. "Sending in the clowns" became a reward for poor behavior, thus increasing, not decreasing, the maladaptive behaviors.

25.     KCS, through Kelton Sweet, also recommended a "rapid staff rotation" technique on the grounds that "[a] new face buys better behavior."   However, this strategy of "rapid staff rotation" runs directly counter to helping a young child with Down syndrome.  By their nature, these children feel safe through calm and *consistency* of teachers, not rapid rotation of different faces and a hyping strategy.

26.     Ultimately, even KCS, through Mr. Sweet, agreed the hyping or clowning strategy was "simply a facade" and "an incomplete solution."  Mr. Sweet referred to his technique as "kind of comical" and "funny keystone cop moment" where "it's enjoyable to watch as well if you didn't mind the tragedy of it all."

27.     KCS, through Mr. Sweet, *knew* the strategy of hyping and rotating faces sent the opposite message to Plaintiff:

> [It] only taught Plaintiff that "she can really, with abandon, just engage in whatever kind of challenging behavior she wishes, and the only thing that's going to happen is life is going to get more interesting.  New, caring people are going to show up.  So this creates a little bit, from a behaviorist's perspective - - and really, it should be from anyone's perspective - - sort of a **disastrous behavioral scenario**.  The prospects of improving behavior, if those conditions remain, are, I would say zero.

28.     Despite the "zero" chance of improving I.L.'s behavior with this approach through animation and rapid staff rotation, KCS continued to employ it.  As Mr. Sweet put it:

> So what we're giving her is a new face, more animated staff, visits to people very frequently, really over-the-top reinforcement frequencies where she doesn't have to endure too much delay or reinforcement.

29.     Defendant Stair, KCS's Educational Supervisor, also recognized that KCS's strategy of "hyping," "animating," or "clowning" was not appropriate.  In fact, Dr. Stair admits this was only crisis management:  "In an emergency, keep the clowns in front of her and she will stay with you....**And the saddest fact about this whole case is we**

**didn't get out of emergency mode much.** So when I think, when you said did we make meaningful gain, I don't think we made progress on her IEP goals, period."

30.    Defendant Stair also agrees with Plaintiffs' contention that the strategy of clowning or "rapid faces" does result in "ramping her up," with attendant consequences.  To Defendant Stair, "pour on the clown," as a strategy, did not work.  Defendant Stair even admits KCS was actually reinforcing the worst behaviors:

> And, since I'm disclosing, let me tell you this.  I think it's worse now than it was.  Not that she's worse but because we can't do what you should do, ignore bad behavior and praise pro-social behavior, she's now learned if I really want your attention, I know exactly how to do it and you will not ignore me know.  **So instead of teaching her replacement behaviors, we've had to reinforce the very worst of her behaviors that we want to extinguish**.

31.    KCS denied behavioral supports to I.L. because it has a practice of too-aggressively placing children in segregated classrooms.  In fact, the federal government requires KCS to document progress in meeting what are called least restrictive environment "indicators." At times relevant hereto, KCS failed to meet any federal indicators and was the worst performing county in all of Tennessee.

C.    4TH GRADE: FENCING I.L.

32.    In August of 2014, I.L. began fourth grade.

33.    I.L.'s mother received reports emanating from a classmate of I.L.'s that she was being "fenced" within the confines of a folding blue gym mat and was crying while inside.

34.    On at least August 11, 12, 13, and 14, 2014, KCS, along with the individual Defendants, placed I.L., a child with an intellectual disability, inside a corner alcove approximately 4 feet by 4 feet and did "fence" her in with a blue gym mat (48" x 72" x 1.5" thick) held by two adults.  This occurred outside of I.L.'s classroom a total of 21

times over the four day period. The durations were greater than ten minutes, including one time of 44 minutes. Combined, in only four days of school, Plaintiff was isolated for at least four hours within the blue gym mat. She did not have access to education during these confinements.

35. I.L.'s mother was not advised of the blue gym mat, nor did she approve its use, prior to any of these events.

36. Defendant Sweet, the same Behavioral Consultant, is the person who recommended and directeKd the use of the blue gym mat upon Plaintiff. He said it was used to "effectively block her from leaving." He said he did not intend for it to be a "timeout."

37. KCS's Special Education Supervisor, Defendant Stair, knew of and watched and supported the blue gym mat being used upon Plaintiff.

38. KCS's Principal, Robbie Norman, knew of and watched and supported the blue gym mat being used upon Plaintiff.

39. In spite of Sweet's own words, KCS contend the use of the blue gym mat was an appropriate "timeout," and therefore not an illegal "isolation."

D.    TDOE

40. Having accepted federal funding, the state, the TDOE, must ensure the IDEA is being met by its local school districts like Knox County Schools. See, e.g., 20 U.S.C. 1412(a)(11). It is responsible for oversight and monitoring, for ensuring personnel development, and for auditing for compliance. Where a local school district is not meeting its obligations to students under IDEA, it may withhold funds to ensure compliance.

9

### D1. Interference with State Administrative Procedure: CRP

41.    To force KCS to comply with the IDEA, Plaintiffs were entitled not only to a due process hearing, but also a Complaint Resolution Procedure (CRP) with the state. 34 C.F.R. 300.151-153.

42.    The CRP provides parents a "mechanism that allows them to resolve differences without resort to more costly and litigious resolution through due process."

43.    Under the CRP, the State Education Agency (SEA) must "[r]eview all relevant information and make an independent determination as to whether the public agency is violating a requirement of [the IDEA]." 34 C.F.R. § 300.152(a)(4). The SEA must also "[i]ssue a written decision to the complainant that addresses each allegation in the complaint and contains . . . [f]indings of fact and conclusions; and . . . [t]he reasons for the SEA's final decision." 34 C.F.R . § 300.152(a)(5).

44.    The Tennessee state legislature has set forth the CRP at Tenn. Code Ann. 49-10-604.  However, it is the TDOE which must *implement* this statute.

45.    I.L.'s mother reviewed a July 15, 2014 letter from TDOE's attorney advising that disputes about matters of placement, least restrictive environment, or FAPE could *not* be brought in a CRP, but only in a due process.  (Ex 35 to Due Process)

46.    That stance is a procedural denial of due process rights because:

> State responsibility for ensuring compliance with the Act includes resolving complaints even if they raise issues that could have been the subject of a due process hearing request. A State's general supervisory responsibility is not satisfied by relying on private enforcement efforts through due process actions for all issues that could be the subject of a due process hearing. In addition, the State complaint process and mediation provide parents and school districts with mechanisms that allow them to resolve differences without resort to more costly and litigious resolution through due process.

64 Fed. Reg. 12406, 12646.

47.    Upon information and belief, on September 18, 2015, the Office of Special Education Programming wrote to TDOE inquiring about the CRP in the context of Least Restrictive Environment.

48.    On October 15, 2014, Mr. Joey Hassell of TDOE responded to OSEP.  TDOE did not acknowledge the fullness of the July 15, 2014 letter from its legal counsel and, in particular, its history of rejecting CRP for cases of LRE or placement.  Rather, this private letter spoke in present and future tense, as if to suggest the CRP was *now* available.  TDOE did not disseminate this letter to Plaintiffs.  It only submitted it directly to OSEP, not publicly.  Publicly, TDOE took no steps to undermine its July 15, 2014 letter denying CRP for cases of LRE and placement—no apology, no admission, no acknowledgment, no policy clarification, no compensatory education offered for anyone affected, no retraction, no stipulation, no findings, nothing to parents.

49.    Nor did TDOE advise OSEP of a history of unavailability of CRP.  Instead, TDOE treated the July 15, 2014 letter as something incomplete or harmless when, in fact, it was significantly harmful.

50.    Against this backdrop, on November 4, 2014, KCS issued "Prior Written Notice" under IDEA, stating it would place I.L. in a more restrictive environment than before.

51.    Based upon the admitted history of not providing a CRP for matters of LRE and FAPE, I.L.'s mother filed for due process on November 17, 2014.

52.    Due process, being adversarial and requiring a hearing or a trial, is *far* more expensive than a CRP.  KCS declared, in an IEP meeting, that I.L. was "suing the school" and the matter was "in litigation."  The due process involved a week of trial over the course of months, motions, discovery, depositions, pre-trial motions, post-trial briefs, a further consolidated hearing, and summary judgment.  Overall, it cost hundreds of

thousands of dollars in attorney time plus costs of experts. All of this could have been avoided had TDOE allowed for CRP and been public about its historical error.

53. The importance of a CRP is particularly important to parents with children with special needs in Knox County due to its organizational legal culture. Unlike most counties, Knox County is self-funded for education disputes. It uses in-house lawyers who are employed by Knox County to defend against due process cases, viewing this as a cost saving and an incentive *not* to settle or resolve matters.

54. This alleged cost-savings approach for the Knox County citizenry at large pits individual parents against significant resources of Knox County, without benefit of an outside evaluation. This, in turn, makes settlement of disputes with KCS more difficult, less efficient, and, far more expensive to parents than CRP.[11]

55. When Plaintiffs raised the issue with respect to CRP at due process, Knox County took the position, in the due process, that this problem would require naming the TDOE.

### D2. TDOE AND THE RISE OF ILLEGAL ISOLATIONS

56. In 2014-2015, KCS *self-reported* 301 isolations of children with disabilities. By comparison to other large school districts, Hamilton County only reported isolating 29 times, Shelby County only reported isolating 13 times, and Davidson

---

[11] The Knox County law director is publicly elected. His recent campaign website states:

> My office does not hire outside counsel unless absolutly [sic] necessary. By using the highly professional attorneys we have on staff, we've reduced payments to outside attorneys by 1.2 million dollars. I ended the practice of paying unneccesary [sic] legal settlements. By fighting for the taxpayer, we've reduced Knox County's settlement [sic] payouts by 2.5 million dollars. www.electbudarmstrong.com (last visited March 14, 2016)

County only reported isolating 25 times. Knox County engaged in more isolations than any other County by far, with the notable exception of Wilson County.[2]

57.     Clearly, the TDOE has not created consistent definitions and given consistent training about acceptable conduct. As a result, the self reported data is ineffective, rendering a statutory mission of reducing or eliminating isolations a nullity.

58.     In connection with and as an extension of the IDEA, Tennessee passed the Special Education Behavioral Supports Act. In important part, this Act has a purpose *to reduce dependency on isolation and restraint practices* upon students with special needs within the public school systems. Tenn. Code Ann. 49-10-1302 *et. seq.*

59.     To do this, in Tennessee, school personnel may only isolate or restrain students with special needs in "emergency situations." *Id.* at 1304(a). Additionally, TDOE promulgated regulations, per 49-10-1306(f), and found at Chapter 0520-01-09-.23, which state that any isolation shall not be longer than one minute per year of the student's age, for longer than the time provided in the child's IEP, or in space having an area less than forty square feet. Schools also must give these procedural safeguards to parents.

60.     Where an "emergency" situation truly does exist, school personnel must evaluate the student's condition and notify the parent or guardian "the same day the isolation or restraint was used." *Id.* at 1304(d)(1). Additionally, if the student's IEP does not provide

---

[2]     In some Knox County schools, the use of isolations and restraints has reached epidemic levels. In 2014-2015, for example, Ridgedale Alternative's 66 – 81 students experienced 448 restraints and 153 isolations. Expressed as a percentage chance of isolations and restraints per pupil, this is 742%, according to self-reported data. In 2014-2015, Knox Adaptive Education Center's 81 – 96 students experienced 160 restraints and 122 isolations. Expressed as a percentage chance of isolations and restraints per pupil, this is 294%.

for isolation or restraint, an IEP meeting must be convened no later than ten (10) days. *Id.* at 1304(d)(2).

61.    School personnel who engage in an emergency isolation or restraint must report the matter to the school principal who shall record the use of the isolation or restraint and the facts surrounding it.  *Id.* at 1304(e)(1).

62.    To ensure consistency and to be able to meet the purposes of the Act, the State Board of Education is responsible for a "standard reporting format."  *Id.* at 1304(e).  TDOE created a standardized form called the "Tennessee Department of Education Report of Isolation/Restraint" to be used by schools.

63.    This form requires schools to complete the following categories of information, among others: Time Isolation or Restraint began and ended; whether persons were certified for behavior intervention; witnesses; time the principal was notified; time the parent was notified; the "antecedent," defined as "the antecedents that immediately preceded the use of the isolation or restraint **and** the specific behavior being addressed"; the student's demeanor; whether the isolation space was "at least forty square feet"; whether injury or death occurred; whether property damage occurred; and whether student was temporarily released from being physically held.

64.    Each year, local schools must submit their information on restraints and isolations to TDOE.  TDOE, in turn, must report this information to "the State Advisory Council for the Education of Students with Disabilities."  With the benefit of this information, the Advisory Council shall advise the State on unmet needs, consult with the Governor, Commissioner of Education, the State Board of Education and the Assistant Commissioner of the Division of Special Populations.

14

65.     It is the duty of the Advisory Council, who has the information on restraints and isolations, to advise TDOE of how to reduce isolations and restraints. Finally, TDOE shall use these recommendations as well as the data to mete out the objectives of the Special Education Behavior Support Act—"reduce or eliminate the use of isolation and restraint in schools." *Id.* at 1306(e).

66.     Plaintiffs contend TDOE, the Advisory Council, the Governor, the Commissioner of Education, and the Assistant Commissioner of the Division of Special Populations have all failed in their collective duties owed to Plaintiffs. The Advisory Council has not given, or TDOE has not accepted, recommendations on how to reduce isolations and restraints, or even ensure consistency among Tennessee schools. In fact, minutes reveal the Advisory Council avoiding the issue of restraints and isolations, postponing the issue, or otherwise not confronting the manifold problems known to exist.

67.     The resulting harm of the intentional inaction is significant.

68.     As demonstrated by this case, TDOE, as the governing body of schools, is not taking sufficient preventive, deterrent, or enforcement action. With a lack of progress monitoring, lack of coercion, and lack of accountability by TDOE, Knox County is routinely engaging in isolations, including upon I.L., which is:

- "unsafe, unreasonable, unwarranted,"

- not an "emergency,"

- conducted without informing parents in 24 hours,

- conducted without giving parents procedural safeguards,

- in spaces less than forty square feet,

- for time periods longer than the child's age,

15

- lacking data of the antecedents *contributing to the child's behavior.*

- are not based on peer reviewed scientific principles.

69.     TDOE has the power and authority to bring KCS into conformity, including withhold funding from Knox County Schools.  However, upon information and belief, no such steps have been taken or threatened.  DOE has an ongoing duty of enforcement and, despite the decision of the ALJ, TDOE has not brought KCS into conformity or otherwise shut down KCS' actions in filing what amounts to a misplaced appeal and bad faith suit against the Plaintiffs for attorneys fees relating to the isolation and abuse.

70.     In the face of a lack of enforcement action, in the instant lawsuit, Knox County Schools is actually seeking to *increase* the circumstances under which it can confine a child—including taking the position that fencing a child with the blue gym mat is appropriate.

71.     KCS has countersued for a declaration that fencing a child with a blue gym mat should be considered an appropriate "timeout," not abuse or illegal isolation.  Despite the hearing officer's finding to the contrary, KCS has even sued the Plaintiffs for attorneys fees for objecting to, and obtaining a favorable ruling that I.L.'s rights were infringed.

72.      Instead of taking affirmative action against Knox County schools, or providing or requiring training, to date, TDOE still has taken no action with respect to Knox County.

73.     TDOE has remained idle in spite of the statistics it has gathered, while Knox County has done all of the following with respect to I.L., actions which can harm other children with disabilities in the future:

- Created a too-liberal definition of "emergency" (or ignored the emergency requirement) under Tenn. Code Ann. 49-10-1304(a) so that it can more liberally use restraints and isolations;

- Refused to determine and document the "antecedents" as the triggers *occurring within the classroom* in order to learn the triggers of aggressive behaviors and, instead, merely documented the child's *behavior* which triggered the isolation or restraint;

- Avoided parental notifications in a timely manner;

- Avoided the giving of procedural safeguards;

- Redefined "isolations" as "timeouts" to evade the statute's purposes and underreport to the state; and

- Used isolations and restraints as a matter of convenience.

E. DAMAGES CLAIMS: UNEQUAL TREATMENT AND EXCLUSION FROM PARTICIPATION

74. The actions or inactions by all Defendants, being deliberately indifferent or intentional, have caused Plaintiffs damages.

75. The denial of reasonable accommodations (appropriate behavioral supports) made it impossible for I.L. to remain in general education. Her behavior was used offensively by KCS as a reason for her removal to a class with less challenging curriculum and inferior instruction. Thus, she was subjected to unequal education as her peers. This not only violates the IDEA's LRE provisions but, separately and independently, violates the integration mandates of Title II of the ADA and 504.

76. Moreover, the use of failed behavioral "strategies," including "clowning" and "fencing" with the blue gym mat, has caused I.L. unequal treatment, exclusion, stigmatization, as well as emotional harm. D.T., the mother, has also suffered

17

emotionally as a result of the treatment of her daughter.  The unequal treatment created a hostile educational environment so much so that D.T. was forced to remove I.L. from school and now is bearing the cost and inconvenience of homeschooling her.

F.     DAMAGES CLAIMS: RETALIATION

77.     D.T., acting as a private citizen on a matter of public concern engaged in protected activity of advocating for her daughter's special needs.  This advocacy—for least restrictive environment—pertains to a matter of important public concern.

78.     In response to the advocacy, beginning in third grade at West Hills, KCS engaged in a pattern of retaliation against Plaintiffs either from a policy or custom or was undertaken by employees with final policymaking authority of indifference to the rights of children with disabilities.

79.     KCS engaged in the chilling adverse and retaliatory action of calling the Department of Children's Services and accusing D.T. of abuse and neglect of her own daughter.

80.     KCS engaged in the chilling adverse and retaliatory action of refusing to provide a behavior improvement plan, resulting in a miserable school experience for I.L.

81.     In response to the advocacy in fourth grade, after D.T. had again vigorously advocated for her daughter's special needs (testifying, bringing due process, cross examining witnesses, and submitting proposed findings, etc.), KCS engaged in further chilling adverse retaliatory action by secretly engaging in fencing I.L. with the blue gym mat.

82.     After prevailing on the issue of violation of the IDEA and Special Education Supports Act, KCS brought counterclaims against Plaintiffs in which KCS sought all of its attorneys fees against D.T., a single mother, and I.L., her daughter with Down

syndrome. This post-due process action was retaliation for Plaintiffs' successful advocacy.

83. Each of these actions, alone or in conjunction with the others, caused emotional harm and the expense and inconvenience of losing the public school opportunity.

## III. LEGAL CLAIMS

84. The foregoing facts are incorporated.

### A. IDEA AND SPECIAL EDUCATION SUPPORTS ACT
### (CLAIMS AGAINST TDOE and/or KCS)

85. Under the cooperative federalism model, TDOE (the state, or SEA) and KCS (the local, or LEA) are each responsible for ensuring a free, safe and appropriate public education. The SEA also has supervisory obligations which include ensuring IDEA is met, developing personnel within the LEA, and developing corrective action plans which, with respect to I.L., have not occurred.

86. Plaintiffs allege interference with or denial of procedural safeguards of a CRP against TDOE.

87. Plaintiffs allege predetermination of more restrictive setting against KCS and TDOE.

88. Plaintiffs allege denial of FAPE under IDEA against KCS and TDOE.

89. Plaintiffs allege denial of Least Restrictive Environment against KCS and TDOE.

90. Additionally, for fourth grade, Plaintiff respectfully moves for implementation of the ALJ's Order with respect to the violations of Special Education Supports Act and IDEA, that Defendant Kelton Sweet shall have no further contact with I.L., that I.L. is to receive compensatory education, along with appropriate attorneys fees and costs.

## B. ADA AND 504 DISCRIMINATION
### (CLAIMS AGAINST KCS and TDOE)

91.     KCS, aided by TDOE, utilized illegal isolations upon I.L. which caused her an unequal education to her peers and created a hostile educational experience.

92.     Under 34 CFR 104.33(b)(1), KCS denied IL regular or special education aids and services designed to meet her educational needs as adequately as needs of persons without disabilities are met.  KCS also denied I.L the reasonable accommodation of positive and scientifically based behavioral supports which, in turn, resulted in an unequal educational opportunity.  Additionally, KCS's proposed placement outside of regular education classes (which the ALJ endorsed) would deny I.L. meaningful access to educational opportunities including equal academic subjects and curriculum under the integration mandates of the ADA and 504.

93.     The intentional actions of denying I.L. the necessary behavioral supports, refusing to allow her to work on agreed-upon IEP goals, and KCS' affirmative acts of fencing her with the blue gym mat all contributed to a hostile educational environment for her—in contrast to I.L.'s non-disabled classmates' educational experiences.

94.     These actions or inactions were undertaken intentionally or with deliberate indifference.

## B. RETALIATION UNDER FIRST AMENDMENT, ADA, AND 504
### (CLAIMS AGAINST KCS)

95.      Plaintiffs bring retaliation claims against KCS alone.  The retaliation claims are brought under Section 504 and the ADA and the First Amendment to the Constitution (and 42 U.S.C. §1983).  This includes retaliation in intentionally and falsely accusing D.T. of tolerating abuse or neglect of her daughter to DCS; intentionally denying I.L. a behavior intervention plan; intentionally fencing I.L. with the blue gym mat; and the

intentional filing of counterclaims against Plaintiffs for attorneys fees arising out of the use of the blue gym mat upon I.L.

## C. STATE LAW CLAIMS
### (CLAIMS AGAINST KCS AND INDIVIDUAL DEFENDANTS)

96.     Plaintiffs bring state law claims of Negligence, Gross Negligence, Negligence Per se, and False Imprisonment <u>against KCS</u> arising from the use of the blue gym mat upon I.L.

97.     Plaintiffs bring state law claims against all of the <u>individual defendants</u> for Negligence, Gross Negligence, Negligence Per se and False Imprisonment arising from the use of the blue gym mat upon I.L.

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs request process be served, that Defendant be compelled to timely answer, and that Plaintiffs be awarded:

(1) Reversal of the ALJ's order under the IDEA (for Third Grade) due to denial of FAPE, denial of least restrictive environment, and denial of the provision of adequate supports, aids and services, along with attorneys fees and costs;

(2) Affirmance and implementation of the ALJ's order during fourth grade under the IDEA and the Special Education Behavior Supports Act (for Fourth Grade), along with attorneys fees and costs;

(3) Appropriate damages under ADA and 504 and/or First Amendment and 42 U.S.C. §1983, including reimbursement for the costs of educating I.L. privately, emotional distress damages, attorneys fees and other costs, and any further relief at law or equity;

(4) Injunctive relief of non-retaliation and provision of reasonable accommodations in order that I.L. could return to Knox County Schools, along with implementation of the attainable educational goals in the LRE, appropriate behavioral supports, and no illegal isolation or restraint or abuse.

Respectfully submitted,

**GILBERT RUSSELL McWHERTER SCOTT & BOBBITT, PLC**

s/Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite    504
Chattanooga, TN 37402
Telephone: 423-499-3044
Facsimile: 731-664-1540
jgilbert@gilbertfirm.com

Michael L. Russell (TN Bar No. 20268)
341 Cool Springs Boulevard, Suite 230
Franklin, TN 37064
Telephone: 615-354-1144
Facsimile: 731-664-1540
mrussell@gilbertfirm.com

Jessica F. Salonus (TN Bar No. 28158)
101 North Highland
Jackson, TN 38301
Telephone: 731-664-1340
Facsimile: 731-664-1540
jsalonus@gilbertfirm.com

***ATTORNEYS FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2016, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

Susan E. Crabtree
Amanda L. Morse
Deputy Law Directors
612 City-County Building
400 Main Ave.
Knoxville, TN 37902

Melinda Jacobs
163 Kelly Ridge Road
Townsend, TN 37882

s/ Justin S. Gilbert