# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| **I.L., a minor through her parent Donna Taylor, and DONNA TAYLOR,** | ) | |
| | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| *and Counter-Defendants,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KNOX COUNTY BOARD OF EDUCATION,** | ) | |
| | ) | **No. 3:15-cv-558** |
| *Defendant* | ) | **Reeves/Guyton** |
| *and Counter-Claimant,* | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **KNOX COUNTY, TENNESSEE; and TENNESSEE DEPARTMENT OF EDUCATION,** | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>Memorandum Opinion and Order</u>

"Nothing about this case is typical." Hr'g Tr. at 980:13–14. It involves a daughter with Down syndrome and her mother. It involves the mother's efforts to integrate her daughter into public school, the schools' efforts to honor the mother's efforts, and the state's response to how its schools treat disabled students. It involves the Individuals with Disabilities Education Act, the Americans with Disabilities Act, the Rehabilitation Act, and the Tennessee Special Education Behavioral Supports Act. It involves a 3000-page administrative record from the state. And it involves ten motions that have been filed over the past thirteen months. They are as follows:

1. the Tennessee Department of Education's motion to dismiss;

2. the Department's motion for summary judgment;

3. Plaintiffs' motion for partial summary judgment against the Department;

4. the Department's countermotion for summary judgment;

5. Plaintiffs' motion to admit the Department of Education's answer to an interrogatory showing a violation of the Special Education Behavioral Supports Act;

6. Knox County Schools's motion to strike the interrogatory answer;

7. Plaintiffs' motion for judgment on the administrative record;

8. Knox County Schools's motion for judgment on the administrative record;

9. the Department's motion to stay this case until the Court rules on the pending motions; and

10. Defendants' motion to continue trial.

And for the reasons stated below, the Court orders as follows:

1. the Department's motion to dismiss is granted in part and denied in part;

2. the Department's motion for summary judgment is granted;

3. Plaintiffs' motion for partial summary judgment is denied;

4. the Department's countermotion for summary judgment is denied as moot;

5. Plaintiffs' motion to admit the Department's answer to an interrogatory is denied;

6. Knox County Schools's motion to strike is denied as moot;

7. the motions for judgment on the administrative record are granted in favor of Knox County Schools on the IDEA claims and in favor of Taylor on the IDEA–Supports Act claim, and the Court orders remedies;

8. the Department's motion to stay is denied as moot; and

9. Defendants' motion to continue is granted.

*Table of Contents*

I. Background …………………………………………………………………….. 5

  A. Legal ……………………………………………………………………….... 5

    1. Individuals with Disabilities Education Act ……………………………… 5

    2. Americans with Disabilities Act Title II, Rehabilitation Act § 504 ………………… 7

    3. Special Education Behavioral Supports Act ……………………………….... 7

  B. Factual ……………………………………………………………………… 8

    1. Facts ……………………………………………………………………… 8

    2. Procedural History ……………………………………………………… 9

II. The Department of Education's Motion to Dismiss ………………………………. 11

  A. Legal Standard …………………………………………………………….... 11

  B. The Department's Arguments ……………………………………………….... 11

    1. Taylor Need Not Exhaust Administrative Remedies ………………………… 11

    2. Substantive Arguments ………………………………………………… 15

      i. Taylor Has Not Stated an IDEA Claim for Grievance-Procedure Interference ….. 15

      ii. Taylor Has Stated a Claim for Violating the IDEA Through the Supports Act …. 21

      iii. Taylor Has Stated a Claim Under Title II and § 504 …………………………… 22

III. The Department's Motion for Summary Judgment ………………………………… 29

  A. Legal Standard ……………………………………………………………… 29

  B. The Department's Arguments ……………………………………………….… 30

    1. Taylor Need Not Exhaust Administrative Remedies ………………………… 30

    2. Substantive Arguments ………………………………………………… 30

      i. Taylor Has Not Shown a Genuine Dispute on Her Least-Restrictive-Environment Claims …………………………………………………………… 31

      ii. Taylor Has Not Shown a Genuine Dispute on Her Supports Act Claims ……….. 36

      iii. Taylor Has Not Shown a Genuine Dispute on Her Title II and § 504 Claim ……. 37

IV. Plaintiffs' Motion for Partial Summary Judgment Is Denied ……………………… 38

V. The Department's Countermotion for Summary Judgment Is Denied as Moot ................ 38

VI. Plaintiffs' Motion to Admit an Answer to an Interrogatory Is Denied ......................... 38

VII. Motions for Judgment on the Administrative Record ............................................. 40

    A. Facts ................................................................................................................. 40

    B. Legal Standard ................................................................................................. 44

    C. Arguments ........................................................................................................ 45

        1. Knox County Schools Committed No Procedural IDEA Violations ................... 45

            i. The District Had No Duty to Try Behavioral Supports or Place I.L. in a Resource Room ................................................................................................... 45

            ii. The Lack of a Consistent Paraprofessional Did Not Violate the IDEA ............. 47

            iii. The Failure to Implement the 13 Goals Did Not Deny I.L. a FAPE ................ 48

            iv. I.L.'s Teachers Taught to the West Hills IEP, Which Was Not Defective for Lack of Behavioral Supports ................................................................................... 52

            v. Brickey-McCloud Staff Did Not Measure I.L.'s Progress by an Improper Standard ................................................................................................... 56

        2. Knox County Schools Committed No Substantive IDEA Violations ................... 56

        3. Knox County Schools Violated the Supports Act ....................................... 62

    D. Remedies .......................................................................................................... 68

VIII. The Department's Motion to Stay Is Denied as Moot ....................................... 69

IX. Defendants' Motion to Continue Trial Is Granted ............................................... 69

X. Conclusion ........................................................................................................ 70

# I

## A

This case involves three federal laws and one state law. They are complex and chocked full of jargon, so a survey of these laws will help. *See, e.g.*, Transcript of Oral Argument at 47:6–8, *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017) (No. 70-18) (Alito, J.) (remarking that the Individuals with Disabilities Education Act is "frustrating" because it involves a "blizzard of words").

### 1

In 1954, the Supreme Court declared that "education is perhaps the most important function of state and local government." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). But in 1975, Congress found that state and local governments were not providing a proper education to disabled children. *Honig v. Doe*, 484 U.S. 305, 309 (1988); *see also* 20 U.S.C. § 1400(c)(2). So it passed what is now the Individuals with Disabilities Education Act, or IDEA. 20 U.S.C. §§ 1400–1491o. The IDEA's goal is to provide all disabled children with a free appropriate public education, or a FAPE. *See id.* § 1412(a)(1).

A FAPE has four parts. Two are relevant here. First, the school must provide the FAPE "in conformity with the individualized education program required under section 1414(d) of this title." *Id.* § 1401(9)(D). The individual education program—or IEP—is "the centerpiece of the statute's education delivery system for disabled children." *Honig*, 484 U.S. at 311.[1] The IEP includes the child's functionality, her current academic performance, her academic goals, how to measure academic progress, and what accommodations she needs. 20 U.S.C. § 1414(d)(1)(A)(i). A team of school officials, teachers, and the child's parents work together to form the IEP. *Id.* § 1414(d)(1)(B).

Second, the FAPE must "meet the standards of the State educational agency." *Id.* § 1401(9)(B). Here, the state educational agency is the Tennessee Department of Education. The Department

---

[1] "Welcome to—and apologies for—the acronymic world of federal legislation." *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 749 (2017).

must craft a plan that, among other things, allows all disabled children to receive a FAPE in the least-restrictive environment. *Id.* § 1412(a)(1), (5). The Department must then supervise its school districts—or local educational agencies—to ensure that they follow this plan. *Id.* § 1412(a)(11).

The Department must also provide an administrative grievance procedure for disabled children and their parents. *Id.* §§ 1412(a)(6), 1415. This procedure is meant to be a faster, cheaper alternative to litigation. It has several steps. First, the parent may file a complaint on any FAPE-related matter with the school district or the state educational agency. *Id.* § 1415(b)(6). The district or agency then investigates the matter if needed and responds accordingly. 34 C.F.R. § 300.152. Meanwhile, the school convenes a preliminary meeting between the parents, school officials, and the child's IEP team. 20 U.S.C. § 1415(f)(1)(B)(i); 34 C.F.R. § 300.510.

If the preliminary meeting fails to resolve the conflict, then the parties may proceed to mediation. 20 U.S.C. § 1415(e); 34 C.F.R. § 300.506. Mediation is voluntary. 20 U.S.C. § 1415(e)(2)(A)(i). An impartial mediator leads each session, and each session must happen in a timely manner at a place convenient for the parties. *Id.* § 1415(e)(2)(E). The state bears the full cost of mediation. *Id.* § 1415(e)(2)(D).

If mediation fails, or if the parties choose not to mediate, then a party may file a due-process complaint and have a due-process hearing. 20 U.S.C. § 1415(b)(7)(A), (f); 34 C.F.R. § 300.514. An administrative law judge conducts the hearing, under the authority of either the school district or the state educational agency. 34 C.F.R. § 300.511(b)–(c). The ALJ's decision is final. *Id.* § 300.514(a). But if the ALJ acted under the school district's authority, then the parties may appeal to the state educational agency for another due-process hearing. 20 U.S.C. § 1415(g)(1); 34 C.F.R. § 300.514(b)(1). The state due-process hearing is the end of the IDEA's grievance procedure.

The IDEA requires that state educational agencies set up this three-step grievance procedure— complaint resolution, mediation, and due-process hearings. 34 C.F.R. § 300.500. The Tennessee government and the Department of Education have done so. *See* Tenn. Code Ann. §§ 49-10-604 to -606; Tenn. Comp. R. & Regs. 0520-01-09-.01, -.17, -.18. State educational agencies must also

ensure that school districts implement the grievance procedure and tell parents about it. 34 C.F.R. §§ 300.149(a)(1), 300.504. Whether the Department has done so is disputed.

Once the state ALJ issues a decision, the parties may sue in federal court. 20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. §§ 300.514(a), 300.516. But a suit cannot be filed until a state ALJ has issued a decision—that is, until the parties have reached the end of the IDEA's grievance procedure. 20 U.S.C. § 1415(i)(2)(A). This is known as the IDEA's exhaustion rule. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 753 (2017). The rule applies only to claims alleging the denial of a FAPE. *Id.*

## 2

The IDEA's grievance procedure is not limited to IDEA claims. If it were, parties could sidestep it by simply suing under a different law. *Id.* at 755. So claims that could have been brought under the IDEA but weren't must still go through the IDEA's grievance procedure before a court can hear them. 20 U.S.C. § 1415(*l*). The exhaustion rule also applies to these claims. *Id.* Some claims can be brought under the IDEA, the Americans with Disabilities Act, and the Rehabilitation Act. *Fry*, 137 S. Ct. at 750.

Title II of the Americans with Disabilities Act bars public entities from discriminating against people "by reason of" their disabilities. 42 U.S.C. § 12132. This includes public schools. *See, e.g.*, *Fry*, 137 S. Ct. at 756. And under § 504 of the Rehabilitation Act, no one "solely by reason of" her disability can be excluded from a program receiving federal funds. 29 U.S.C. § 794(a). Through the IDEA, public schools receive federal funds in exchange for enacting and enforcing policies to ensure that disabled students receive a FAPE. 20 U.S.C. § 1413(a). Public schools are thus covered by § 504. *See Fry*, 137 S. Ct. at 756. So conduct by school staff can violate the IDEA, Title II, and § 504 all at once. *See id.*

## 3

The IDEA also incorporates state law. *See, e.g.*, 20 U.S.C. § 1412(a)(15)(A). Indeed, a FAPE must "meet the standards of the state educational agency." *Id.* § 1401(9)(B). Thus, even if a school

district complies with federal law, it can still run afoul of the IDEA by violating state law. *Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 457 (6th Cir. 1993).

Tennessee has a statutory scheme meant to provide "special education services sufficient to meet the needs and maximize the capabilities of children with disabilities." TENN. CODE ANN. § 49-10-101(a)(1). Part of that scheme is the Special Education Behavioral Supports Act. *Id.* §§ 49-10-1301 to -1307. The Act outlines when and how school staff may isolate or restrain a disabled student. *Id.* § 49-10-1304. So here, there is a large overlap among the IDEA, Title II, § 504, and Supports Act claims.

**B**

**1**

I.L. is a child with Down syndrome. Donna Taylor is her mother. I.L. is "disabled" under federal law and needs accommodations at school. Her public-school district is Knox County Schools, which is under the Tennessee Department of Education. When I.L. started preschool in 2007, Taylor tried to "mainstream" her daughter into the regular-education class so that I.L. could receive the benefits of being around her nondisabled peers. The District, however, insisted on more accommodations for I.L. than Taylor thought appropriate. Taylor pulled I.L. out of school.

This pattern continued for several years: Taylor would enroll I.L. in public school, the school would insist on more accommodations, and Taylor would disagree and pull I.L. In 2012, I.L. enrolled in homeschooling through the Tennessee Virtual Academy. The Virtual Academy and Taylor formed an IEP for I.L. With this IEP in hand, Taylor returned to Knox County Schools. She enrolled I.L. in third grade at West Hills Elementary School, and West Hills officials adopted I.L.'s IEP with minor adjustments. West Hills staff, however, did not follow the IEP to Taylor's liking. So Taylor transferred I.L. to Brickey-McCloud Elementary School.

Taylor insisted that a new IEP be formed before I.L. started at Brickey-McCloud. Taylor, West Hills officials, and Brickey-McCloud officials worked over several weeks to hammer out a new IEP. They agreed to revise the standards for measuring I.L.'s progress. But they reached a roadblock on the method of satisfying those standards: Taylor maintained that I.L. could achieve them

with only 20 minutes of special education a day, while school officials felt that four hours a day was needed. No new IEP was reached. I.L. continued to be taught under her old IEP.

This time, Taylor sought legal relief. But she did not go through the IDEA's complaint-resolution process. Apparently, a lawyer for the Department of Education had written a letter to the person who would later become Taylor's advisor and I.L.'s advocate. This letter claimed that the complaint-resolution process was meant to address only the procedural aspects of how a school implemented a student's IEP. It was not meant to substantively determine if a student's IEP was actually providing her with a FAPE. So when Taylor wanted to lodge substantive claims against Knox County Schools, this advisor told her not to bother with complaint resolution. Taylor thus skipped ahead and filed a due-process complaint against Knox County Schools on November 17, 2014.

Meanwhile, I.L. started third grade at Brickey-McCloud. But her experience there was no better. Staff used strategies to distract I.L. that aggravated her behavioral issues. There was also a frequent turnover in the staff assigned to I.L. As these practices continued, I.L.'s behavior worsened. IEP meetings followed in January and February 2015, but all they ended in were tears.

In August 2015, I.L. started fourth grade at Brickey-McCloud. What also started was the practice of "fencing" I.L. when she would become especially agitated. Staff would walk I.L. out of the classroom to an alcove in the hallway. They would then take a blue gym mat and close off the alcove with I.L. inside. This created a 4′×4′ area, where I.L. would sit until she calmed down. Over four days in August, I.L. was isolated twenty-one times totaling four hours. But no one told Taylor about this practice until an IEP meeting on August 18. Taylor reacted by pulling I.L. out of school the next day. The day after that she filed a second due-process complaint against Knox County Schools.

**2**

The state administrative law judge consolidated the two due-process complaints, held hearings, and issued a final order on November 16, 2015. The ALJ ruled for Knox County Schools on the

first due-process complaint. Taylor had failed to show, he held, that the IEP proposed by the District would not provide I.L. with a FAPE. The ALJ ordered that the District implement its IEP immediately.

But the ALJ ruled for Taylor on the second complaint, deeming the gym-mat fencings improper under the Supports Act. He ordered Knox County Schools to stop the fencings and give I.L. four makeup days of education. He also barred a special-education expert at Brickey-McCloud from having contact with I.L.

This suit followed on December 17, 2015, with a complaint from Taylor[2] and a countercomplaint from Defendants. Taylor filed an amended complaint in June 16. She named as defendants the Tennessee Department of Education, Knox County and Knox County Schools,[3] and three school officials. In January 2017, the Court granted Taylor's request to dismiss some of her claims, including all claims against the school officials.

Several claims against the District and the Department remain. First, she alleges that they violated the IDEA by denying her the complaint-resolution process; by deciding that I.L. needed a more-restrictive environment before consulting Taylor; by denying I.L. an education in the least-restrictive environment; and by denying I.L. a FAPE. Second, she contends that the Department systemically violated the IDEA by letting school staff violate the Supports Act unchecked. Third, Taylor asserts that the Department and the District discriminated against I.L. because she is disabled, in violation of Title II and § 504. Fourth, Taylor argues that the District's counterclaim is retaliation for winning on her first due-process complaint, in violation of the First Amendment. Last, Taylor alleges that the District's use of gym-mat fencings amounts to negligence, gross negligence, negligence per se, and false imprisonment.

Between May 2016 and April 2017, the parties filed ten motions that are still pending. The Court will address them now.

---

[2] Although I.L. is a plaintiff in this case, Taylor is suing on behalf of I.L. and herself. So the Court will refer only to Taylor.

[3] Taylor treats Knox County and Knox County Schools as one entity, so the Court will too.

## II

First is the Department of Education's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). The Department claims that, because Taylor did not name it as a defendant in the state administrative proceedings, she has failed to exhaust her administrative remedies against it. It also asserts that, even if Taylor exhausted her remedies, she has not stated a claim. For the following reasons, the Court will dismiss Taylor's IDEA grievance-procedure claim, deny the Department's motion on the IDEA–Supports Act claim, and deny the motion on the Title II and § 504 claim.

## A

To survive a motion to dismiss under Rule 12(b)(6), the complaint must state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To determine whether the complaint states a facially plausible claim, the Court takes a two-step approach. *Id.* at 679. First, it separates the complaint's factual allegations from its legal conclusions. All factual allegations, and only the factual allegations, are taken as true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Second, the Court asks whether these factual allegations amount to a plausible claim for relief. *Id.* at 555. The allegations do not need to be highly detailed, but they must do more than simply recite the elements of the offense. *Id.* Specifically, the complaint must plead facts permitting a reasonable inference that the defendant is liable for the alleged conduct. *Id.* If this is not done, the claim will be dismissed. *Id.* at 570.

## B

### 1

The Department contends that Taylor's claim must fail because she has not exhausted the IDEA's grievance procedure. When Taylor filed due-process complaints against Knox County Schools, she did not name the Department as a defendant. Thus, the Department concludes, Taylor cannot now sue it.

The Court disagrees. The text, structure, and history of the IDEA's grievance procedure reveal that the only intended parties to a due-process hearing are the child, the parents, and the school district. The IDEA provides that, after the complaint-resolution process, "the parents or the local educational agency involved in such a complaint shall have the opportunity for an impartial due process hearing." 20 U.SC. § 1415(f)(1)(A). The party requesting a hearing must forward a copy of the due-process complaint to the state educational agency. *Id.* § 1415(b)(7)(A)(i). The IDEA's due-process text implies that the state educational agency will not be a party to the due-process hearing.

The same conclusion follows from the structure of the IDEA's grievance procedure. The first step is filing a complaint. *Id.* § 1415(b)(6). While § 1415(b)(6) states only that there must be a chance for "any party" to file a complaint, § 1415 later describes the parties involved in the complaint as "the parents or the local educational agency involved." *Id.* § 1415(f)(1)(A).

If complaint resolution fails, then the parties can mediate. *Id.* § 1415(e). If mediation fails or the parties decline mediation, then the dispute moves to the due-process hearing. *Id.* § 1415(f). But before the hearing, "the local education agency" must convene a meeting with the parents and the IEP team. *Id.* § 1415(f)(B)(i). At this meeting, "the local educational agency" must have a chance to resolve the complaint. *Id.* § 1415(f)(1)(B)(i)(IV).

"If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur . . . ." *Id.* § 1415(f)(1)(B)(ii). The hearing may be conducted by the local agency (the school district) or the state agency. *Id.* § 1415(f)(1)(A). But since the local agency might be a party, decisions from a local due-process hearing are appealable to the state agency. *Id.* § 1415(g)(1). Decisions from a state due-process hearing are not appealable. *Id.* § 1415(i)(2)(A). Instead, the only option is a lawsuit. *Id.*

Thus, the IDEA's grievance procedure is concerned only with how the child, the parents, and the school district will resolve disputes. The state educational agency has one main job: to act as a neutral third party who holds due-process hearings. And the inability to appeal from state hearings

reveals that there is no risk of the state agency being impartial, since it is not a party. The structure of the IDEA's grievance procedure implies that state educational agencies were not meant to be parties to due-process hearings.

The IDEA's legislative history further supports this reading. In 2004, the IDEA was revised in two relevant ways. First, the due-process provisions were amended "to clarify that a parent, as well as a local educational agency, has an opportunity to have a due process hearing after filing a complaint." S. REP. NO. 108-185, at 37 (2003). Congress wanted to leave no doubt that school districts—not just parents—may request due-process hearings. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing S. REP. NO. 108-185, at 37).

Second, the preliminary-hearing provisions were added. "The goal of these provisions is fairness: to be sure that a district is aware of a problem and has a chance to resolve it in a less formal manner before having to spend the time and resources for a due process hearing." S. REP. NO. 108-185, at 39. In other words, these provisions were added to spare parents and school districts from due-process hearings. The text, structure, and history of the IDEA's grievance procedure thus reveal that state educational agencies were not meant to be parties to due-process hearings. Taylor did not have to name the Department of Education as a defendant in her due-process complaints.

The Department insists that "without an administrative hearing, [it] is unaware of the facts concerning a student's complaint until a lawsuit has been filed." [D. 29 at 11]. This argument ignores the text of federal and state law. When someone files a complaint to start the complaint-resolution process, she must provide a copy to the Department. 34 C.F.R. § 300.151(a)(1)(i). Once the Department receives the complaint, it "shall promptly investigate" and, if necessary, issue written findings to the parent and school district. TENN. CODE ANN. § 49-10-604(2)–(3); *see also* 34 C.F.R. § 300.152(a). And when the due-process complaint is finally filed, a copy must be sent to the Department. 34 C.F.R. § 300.508(a)(2). The Department then holds a due-process hearing. TENN. CODE ANN. § 49-10-606(a); 34 C.F.R. § 300.511(b). Once the hearing is over—whether or not the ALJ has issued a ruling yet—the Department can address the issues raised in the complaint.

34 C.F.R. § 300.152(c)(1). Without an administrative hearing, the Department is twice made aware of the facts concerning a student's complaint before a lawsuit has been filed.

The Department also cites the Fifth Circuit's decision in *Papania-Jones v. Dupree*, 275 F. App'x 301 (5th Cir. 2008) (per curiam). In *Papania-Jones*, the court upheld the dismissal of an IDEA claim against a state agency. *Id.* at 304. It did so because the plaintiffs had not filed a due-process complaint and so had failed to exhaust the IDEA's grievance procedure. *Id.* The Department cites this decision as evidence that state agencies can be defendants to due-process hearings.

There are several problems with this argument. True, the court in *Papania-Jones* did require a due-process hearing against a state educational agency. But in that case, no one argued whether state agencies were proper parties to due-process hearings. The court had no need to address the issue.

And there is a deeper problem with the reasoning in *Papania-Jones*. In that case, the child was part of a state program managed by the state department of health and authorized by Subchapter III of the IDEA. *Id.* at 302; *see Tucker ex rel. Tucker v. Calloway Cty. Bd. of Educ.*, 136 F.3d 495, 500 n.18 (6th Cir. 1998). Subchapter III concerns disabled infants and toddlers. 20 U.S.C. § 1431(a). It provides for a single statewide system of administration headed by a state agency. *Id.* § 1435(a)(10). And if disputes arise, Subchapter III has its own grievance procedure. *Id.* § 1439; 34 C.F.R. §§ 303.430–303.449. So when parents of a disabled infant seek a due-process hearing, the only possible defendant is the state agency. Thus, in *Papania-Jones*, the only possible defendant was the state agency.

To be sure, the *Papania-Jones* court did not cite anything in Subchapter III. Instead, it concerned itself only with the grievance procedure at issue in this suit. But this procedure comes from Subchapter II of the IDEA, which addresses only disputes about a disabled child's school placement or education. 20 U.S.C. § 1415(b)(6)(A). Infants and toddlers are people under three years old. *Id.* § 1432(5)(A). They have no need for formal education, much less a need for due-process hearings about school placement or education. *See id.* §§ 1431(a)(2), 1411(a)(2)(B)(i)(I). So it is unclear why the *Papania-Jones* court addressed the Subchapter II grievance procedure, rather than

14

its Subchapter III counterpart. Maybe it's because states can adopt the Subchapter II procedure for Subchapter III disputes. 34 C.F.R. § 303.430(d)(2). Or maybe it's because Subchapter III funds can be used to provide a FAPE to children from their third birthday to the start of the next school year. 20 U.S.C. § 1483(3). Regardless, the court's reasoning is unclear. *Papania-Jones* has no persuasive power here. When a child is taught by a local educational agency, parents are not required to name the state educational agency as a party in the administrative proceedings. Taylor did not have to exhaust her administrative remedies against the Department before suing it.

**2**

The Department next contends that Taylor's claims against it should be dismissed. Taylor alleges that the Department violated the IDEA by interfering with her right to the complaint-resolution process, violated the Supports Act, and violated Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. Only the first claim will be dismissed.

### (i) Taylor Has Not Stated an IDEA Claim of Grievance-Procedure Interference

First, Taylor claims that the Department of Education violated the IDEA by interfering with her right to use the IDEA's complaint-resolution process. As she described, a Department attorney sent a letter to the person who would later become Taylor's advisor and I.L.'s advocate. The letter wrongly explained that the complaint-resolution process was meant only for procedural denials of a FAPE, not substantive denials. So when Taylor sought to bring substantive claims against Knox County Schools, the advocate advised Taylor to skip ahead to a due-process hearing. Due-process hearings are costlier and more time-consuming than the complaint-resolution process. Taylor alleges that this interference with her right to use the IDEA's grievance procedure cost her time and money. She is bringing this claim under the IDEA itself.

Claims of IDEA grievance-procedure interference, however, cannot be brought under the IDEA, because the IDEA contains no private right of action for grievance-procedure interference. Private rights of action can be express or implied. The IDEA has no express private right of action

for grievance-procedure interference. "An express federal cause of action states, in so many words, that the law permits a claimant to bring a claim in federal court." *Traverse Bay Area Inter. Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (internal quotation marks omitted). For instance, when a state seriously fails to follow the IDEA, the U.S. Secretary of Education can "refer the matter for appropriate enforcement action, which may include referral to the Department of Justice." 20 U.S.C. § 1416(e)(2)(B)(vi) (cleaned up).[4] No equivalent exists for parents and children. *See id.* § 1415. No express right of action exists to sue under the IDEA for grievance-procedure interference.

To be sure, this conclusion contradicts the Third Circuit's decision in *Beth V. ex rel. Yvonne v. Carroll*, 87 F.3d 80 (3d Cir. 1995). In *Beth V.*, the court held that the text of § 1415 expressly allows parents to sue when they are boxed out of the IDEA's grievance procedure. *Id.* at 88. It based its holding on two reasons. Neither, however, is persuasive.

First, the *Beth V.* court looked to § 1415's text. It noted that, when someone files a complaint, she may take her complaint all the way through the grievance process and then sue. *Id.* at 86. A complaint can be filed on "any matter" related to a child's placement or education. *Id.* at 85 (quoting now-20 U.S.C. § 1415(b)(6)). And a state's interference with the IDEA's grievance procedure is "any matter" related to a child's placement or education. *Id.* at 86. Thus, under § 1415's text, grievance-procedure interference can be grounds to sue.

The Supreme Court has since invalidated the third step in this reasoning. As the *Beth V.* court noted, the IDEA's grievance procedure applies to "any matter" related to a child's placement or education. 20 U.S.C. § 1415(b)(6). But not only *can* these claims be brought through the IDEA's grievance procedure before suing—under the IDEA's exhaustion rule, these claims *must* be brought through the grievance procedure before suing. *Id.* § 1415(*l*). And in *Fry v. Napoleon Community Schools*, 137 S. Ct. 743 (2017), the Supreme Court had to interpret the scope of this exhaustion rule.

---

[4] *See* Jack Metzler, *Cleaning Up Quotations* (Mar. 20, 2017), https://ssrn.com/abstract=2935374.

The Court's holding was clear: "The only relief that an IDEA officer can give—hence the thing a plaintiff must seek in order to trigger § 1415(*l*)'s exhaustion rule—is the relief for the denial of a FAPE." *Id.* at 753. So under the IDEA, if a claim concerns "any matter" related to a child's placement or education, then it can be brought through the grievance procedure. 20 U.S.C. § 1415(b)(6). But under *Fry*, a claim can be brought through the grievance procedure only if an IDEA officer could give relief for it. The only wrong that IDEA officers can relive is the denial of a FAPE. Thus, "any matter" related to a child's placement or education really means any matter related to the denial of a FAPE. The question is thus whether grievance-procedure interference is a matter related to the denial of a FAPE.

It is not. IDEA officers can relieve substantive and procedural violations of the IDEA. 20 U.S.C. § 1415(f)(3)(E). Substantive violations happen when a school does not provide "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). Grievance-procedure availability is not related to whether a school provides such an IEP.

Procedural violations concern "the preparation of an IEP." *Bd. of Educ. of Hendrick Hudson Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). These include the identification, evaluation, placement, and IEP-formation procedures outlined in § 1414. The grievance procedure does not directly concern the preparation of an IEP. Indeed, the fact that the grievance procedure can be used for both substantive and procedural IDEA violations shows that grievance-procedure interference is neither. An IDEA officer would not have the power to right that wrong.

There is also a practical problem. As *Fry* held, whether someone must use the IDEA's grievance procedure depends on whether an IDEA officer could offer relief. But if someone is denied all use of the grievance procedure, then she is denied an IDEA officer. Hence no officer would be able to provide relief. In other words, the IDEA's grievance procedure might be unable to fix interference with its own use. Under *Fry*, a party can sue under the IDEA only for the denial of a FAPE. Grievance-procedure interference is not related to the denial of a FAPE. So *Fry* has invalidated the textual reasoning of *Beth V.*

Second, the *Beth V.* court looked to the IDEA's purposes, as stated in its text. Then (as now) two of the law's goals were (1) to protect the rights of disabled children and their parents; and (2) to ensure that all disabled children have a FAPE that can prepare them for further education, employment, and independence. 34 C.F.R. § 300.1(a)–(b); *Beth V.*, 87 F.3d at 87; *accord* 20 U.S.C. § 1400(d)(1)(A)–(B). A private right to sue for grievance-procedure interference would carry out the first goal, thus ensuring that the second goal is carried out. *Beth V.*, 87 F.3d at 87–88.

This argument does not by itself reveal an express right to sue under the IDEA for grievance-procedure interference. An express right to sue must be stated in the statute's text. *See Traverse Bay*, 615 F.3d at 627–28. The *Beth V.* court's second line of reasoning drew no conclusion directly from the IDEA's text. Instead, it used this reasoning to bolster its textual reasoning. But *Fry* has upended the textual reasoning. And this purpose-based reasoning cannot by itself reveal an express right of action. So there is no express right to sue under the IDEA for grievance-procedure interference. Taylor's claim will fail unless the IDEA provides an implied right to sue.

The IDEA provides no implied right to sue for grievance-procedure interference. Here, the Court must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Thus, Taylor's claim will fail unless the IDEA reveals a congressional intent to create both a private right and a private remedy for interfering with the use of the IDEA's grievance procedure.

The IDEA reveals no such intent. First, the IDEA's text implies that there is no private right to sue. The Court will look at the text of the IDEA's statutes but not the text of its regulations, because "a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Id.* at 291. And when looking at the IDEA's statutes, the Court considers "the entire statutory scheme." *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 523 (2007). So the Court will look at not just the IDEA's grievance procedure in § 1415, but also the Act's enforcement provisions.

These enforcement provisions reveal that Congress gave all grievance-procedure-protection power to the Executive Branch, with none left for private people. "The express provision of one

method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Beyond § 1415's grievance procedure itself, enforcement of the IDEA is left to the U.S. Secretary of Education. 20 U.S.C. § 1416. This suggests that there is no implied private right to sue.

This conclusion is bolstered by the complexity of the Secretary's enforcement system. "The sheer complexity associated with enforcing" a federal law, "coupled with the express provision of an administrative remedy," implies that there is no private right to sue. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015). The IDEA prescribes a detailed system of oversight and enforcement, which the Secretary must follow. 20 U.S.C. § 1416. And in turn, she must require the states to implement a detailed system of oversight and enforcement. *Id.* § 1416(a)(1)(C). Most important, the Secretary must ensure that states implement the IDEA's grievance procedure. *Id.* §§ 1412(a)(11)(A)(i), 1416(a)(1)(A)–(B). This system of oversight and enforcement suggests that the IDEA offers no private right to sue for grievance-procedure interference.

The IDEA's constitutional basis also weighs against a private right to sue. Congress passed the IDEA under the authority of the Constitution's Spending Clause. *Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 295 (2006). The IDEA gives states federal funds for special education, but only if the states agree to carry out the IDEA. And "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Id.* at 296 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). The IDEA is clear that, if a state accepts federal funds, the Secretary can sue it for not providing the grievance procedure. The IDEA is not clear that, if a state accepts federal funds, private people can sue it for not providing the grievance procedure.

And even if there were a private right to sue, Taylor would not be able to win her desired remedy. Taylor claims that she was denied the use of the state's complaint-resolution process. She makes this claim largely because the due-process hearing, "being adversarial and requiring a hearing or trial, is *far* more expensive" than the complaint-resolution process. [D. 20 ¶ 52]. But no one can recover damages for IDEA violations. *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980

F.2d 382, 386 (6th Cir. 1992). So Taylor cannot recover the cost of the due-process hearing anyway.

Finally, other district courts have ruled that the IDEA contains no private right of action, including one within the Sixth Circuit. *See, e.g.*, *T.S. v. Utica Cmty. Sch.*, No. 11-cv-13092, 2013 WL 5954425, at *8 (E.D. Mich. Nov. 7, 2013); *Va. Office of Prot. & Advocacy v. Va. Dep't of Educ.*, 262 F. Supp. 2d 648, 660 (E.D. Va. 2003). The IDEA thus provides no private right to sue for interfering with the use of its grievance procedure.

To be sure, this conclusion goes against some California federal decisions. *See, e.g.*, *Morgan Hill Concerned Parents Ass'n v. Cal. Dep't of Educ.*, No. 2:11-cv-3471-KJM-AC, 2013 WL 1326301, at *7–8 (E.D. Cal. Mar. 29, 2013). But these decisions are based on reasons that have no bearing here. First, they rely on the text of § 1415, just like in *Beth V. See id.* at *7. This textual reasoning, however, was upended by *Fry*. Second, they rely on the Ninth Circuit's habit of hearing appeals from the complaint-resolution process, even if there was no due-process hearing. *Id.* at *2. The Sixth Circuit has no such habit. The California cases are not persuasive.

One might object that this ruling leaves disabled children and their parents without a remedy. But in fact, plaintiffs can sue under § 1983 for IDEA violations. *See, e.g.*, *F.H. ex rel. Hall v. Memphis City Sch.*, 764 F.3d 638, 643–44 (6th Cir. 2014). Of course, the Court takes no position on whether Taylor would be able to sue under § 1983. After all, "whether a statutory violation may be enforced through § 1983 is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute." *Gonzaga Univ v. Doe*, 536 U.S. 273, 283 (2007) (internal quotation marks omitted). The point simply is that, when someone suffers a wrong under the IDEA that can't be righted by suing under the IDEA, § 1983 might be available.

One might also object that this ruling leaves no way to sue for systemic IDEA violations. Such suits, however, are expressly allowed by the IDEA. It allows people to sue "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6), (i)(2)(A). Plaintiffs who allege systemic violations are still suing with respect to identification, evaluation,

placement, or FAPE provision. Their suits are simply on a bigger scale. *See, e.g.*, *A.G. v. Tenn. Dep't of Educ.*, No. 1:16-cv-27, 2017 WL 112526, at *4–5 (M.D. Tenn. Jan. 11, 2017). The only difference with systemic allegations is that they are not subject to the exhaustion rule. *Id.* at *4. So parents may still sue under the IDEA for systemic violations.

According to Taylor, the Department's letter stopped her from using the IDEA's complaint-resolution process. That may or may not be true. But because she brought her claim under the IDEA, it must be dismissed.

### (ii) Taylor Has Stated a Claim for Violating the IDEA Through the Supports Act

Taylor asserts that Knox County Schools systemically fails to follow the Supports Act, denying students a FAPE. She also asserts that the Department has a duty to make sure that school districts do not deny students a FAPE. Thus, the Department must ensure that Knox County Schools follows the Supports Act. Taylor claims that the Department of Education is breaching that duty, violating the Supports Act. The Department counters that Taylor cannot sue it in federal court for violating state law and that, even if she can, it has complied with the Act.

Taylor can sue the Department in federal court under the Supports Act. She cannot bring a standalone Supports Act claim against the Department, because it is part of the Tennessee government. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996). So Taylor can sue the Department under the Act only if it is incorporated into the IDEA.

It is. If a state special-education law is more protective than the IDEA, a violation of state law can amount to a violation of the IDEA. *Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 457 (6th Cir. 1993); *see also* 20 U.S.C. § 1401(9)(B). The IDEA has no specific rules about the use of isolation and restraint. The Supports Act, by contrast, "clearly creates specific obligations related to the use of isolation and restraint that go beyond the basic scope of the IDEA's requirements. Accordingly, under *Doe*, these provisions are enforceable under the IDEA." *N.S. v. Tenn. Dep't of Educ.*, No. 3:16-cv-610, 2016 WL 3763264, at *7 n.4 (M.D. Tenn. July 14, 2016); *see also Mallory ex rel. BM v. Knox Cty. Sch. Dist.*, No. 3:06-cv-122, 2006 WL 3484015, at *6

(E.D. Tenn. Nov. 30, 2006) (Jordan, J.). Because the Supports Act is enforceable under the IDEA, the Department can be liable for violating it.

And Taylor has stated a plausible claim for violating the Supports Act. The Department must ensure that school districts follow the IDEA. 20 U.S.C. §§ 1412(a)(11)(A)(i), 1414(d)(2)(A). If the Department does not do so, it may be sued. *Id.* § 1415(i)(2)(A). Taylor alleges that the Department has failed to enforce the Supports Act against school districts. [D. 20 ¶¶ 68–69, 85, 90]. The Supports Act is incorporated into the IDEA. So Taylor has properly alleged that the Department has violated the Supports Act.

### (iii) Taylor Has Stated a Claim Under Title II and § 504

Last, Taylor is suing the Department under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act. She is bringing this claim for I.L., not for herself. Both statutes ban disability discrimination. 42 U.S.C. § 12132 (Title II); 29 U.S.C. § 794(a) (§ 504). The Department contends that this claim is barred by the statute of limitations and that Taylor has failed to state a claim.

Taylor has properly alleged a Title II and § 504 violation. I.L.'s claim is not barred by the statute of limitations. Tennessee law provides the statute of limitations for I.L.'s Title II and § 504 claim. *See McCormick v. Miami Univ.*, 693 F.3d 654, 662–64 (6th Cir. 2012). Under the Tennessee statute, Taylor must have brought I.L.'s claim within one year of when I.L. suffered discrimination. Tenn. Code Ann. § 28-3-104(a)(1)(A); *see Williams v. Trevecca Nazarene Coll.*, 162 F.3d 1162, at *1 n.2 (6th Cir. 1998) (unpublished). But according to Taylor's complaint, the Department discriminated against I.L. fourteen months before Taylor sued. [D. 20 ¶¶ 32, 34]. So I.L.'s claim is time barred unless the statute of limitations has been tolled.

It has been. Tennessee law also provides the tolling statute. "When the statute of limitations is borrowed from state law, so too are the state's tolling provisions, except when they are inconsistent with the federal policy underlying the cause of action under consideration." *Bishop v. Children's Ctr. for Dev. Enrichment*, 618 F.3d 533, 537 (6th Cir. 2010) (internal quotation marks omitted).

The policies underlying Title II and § 504 are to eliminate disability discrimination and maximize opportunities for disabled people. 42 U.S.C. § 12101(b); 29 U.S.C. § 701(b). Tennessee's minority-tolling statute allows minors more time to sue for disability discrimination. *See* TENN. CODE ANN. § 28-1-106(a). This does not undermine the goals of Title II or § 504. *See Bishop*, 618 F.3d at 538. So if the minority-tolling law applies to I.L.'s claim, then it is not time barred.

Tennessee's minority-tolling law applies to I.L.'s Title II and § 504 claim. The law freezes the statute of limitations "for so long as the person to whom the claim belongs is under a disability because of age or unsound mind." *Sullivan ex rel. Beneficiaries v. Chattanooga Med. Inv'rs, LP*, 221 S.W.3d 506, 510 (Tenn. 2007) (discussing TENN. CODE ANN. § 28-1-106(a)). The Title II and § 504 claim belongs to I.L., who is still a minor. Her claim is not time barred.

Taylor has also stated a plausible claim. She alleges that the gym-mat fencings violated Title II and § 504, and were made possible by the Department's deliberate indifference. The Department counters that it cannot be liable for the District's actions and that it was not deliberately indifferent.

Neither of the Department's arguments is convincing. First, the Department can be liable for the actions of Knox County Schools. To be clear, Taylor does not assert that the Department is vicariously liable for the District's actions. Instead, she asserts that the Department is directly liable for its own deliberate indifference to the District's actions. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 454 (6th Cir. 2008); *see also Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 641 (1999). This claim can survive only if the Department had a duty to protect I.L. from discrimination by Knox County Schools. The Department says that, under Tennessee law, it had no such duty.[5]

The law says otherwise. "The commissioner of education"—the Department's head—"is responsible for the implementation of law or polices established by the general assembly or the state board of education." TENN. CODE ANN. § 49-1-201(a). And the Department must "see that the school laws and the regulations of the state board of education are faithfully executed." *Id.* § 49-

---

[5] It is unclear why the Department makes a state-law argument. At issue here is Taylor's Title II and § 504 claim. It is not established that these statutes provide for supervisory liability. Nor is it established that these statutes incorporate state law on supervisory liability. But the Department does not address these points, so neither will the Court. *See, e.g.*, *United States v. 2007 BMW 335i Convertible*, 648 F. Supp. 2d 944, 952 (N.D. Ohio 2009).

1-201(c)(5) (cleaned up). Tennessee law requires school districts to provide a FAPE to all disabled students. TENN. CODE ANN. § 49-10-103(a). A child can be denied a FAPE when she is not offered reasonable accommodations for her disability. *See Doe v. Woodford Cty. Bd. of Educ.*, 213 F.3d 921, 925 (6th Cir. 2000). So Tennessee law requires the Department to ensure that school districts offer reasonable accommodations to their disabled students.

The Department levels two arguments against this conclusion, but neither is persuasive. First, the Department cites the Tennessee statute on how the Department can enforce state law. Tennessee Code § 49-10-109(a) lets the Department withhold funds from a school district if the district has "failed to provide necessary education to *all children* with disabilities who by law are entitled to receive the education from the school district" (emphasis added). The Department reads *all children* as limiting this provision to the extreme situation where no disabled child receives necessary education. Taylor, the argument goes, has not alleged that Knox County Schools failed to provide necessary education. Thus, her claim fails.

This argument reads *all children* as individualized to every single disabled child, rather than as looking at the group of a district's disabled children. Yet there are three reasons to reject an individualized reading. For one, it would be impractical for the Department to confirm whether a school district has failed literally every single one of its disabled children.

For another, other parts of the statute suggest a broader reading of *all children*. If a school district fails all disabled children, then the Department may take over special education for the district. TENN. CODE ANN. § 49-10-109(c). But it must return special education to the district "as soon as the commissioner finds that [the district] is willing and able to fulfill its responsibilities pursuant to law." *Id.* § 49-10-109(e)(3). That is, the district need only show the commissioner that it *can* educate its disabled children—not that it *will* educate each and every disabled child. This suggests that the Department can take over special education when a district has failed to educate its disabled children as a group, not as individuals.

For still another, an individualized reading of *all children* would stop the Department from intervening when it is direly needed, while letting it intervene when the school district might not

be to blame. Consider a school district that fails to provide an education to 9,999 disabled children, but properly educates one lucky child. Under the Department's individualized reading, the district would somehow still be fulfilling its responsibilities. So the Department could not intervene, even though the district is failing 99.99% of its disabled children.

Now consider another school system that has only 5 disabled children, all of whom suddenly need a new IEP right away. Until those children receive a new IEP and are taught to it, the district—through no fault of its own—is failing each and every one of its disabled children. But under the Department's individualized reading of *all children*, it could choke off funds to the district.

A group-based reading of *all children*, however, presents none of these problems. It is much simpler for the Department to determine if a district is failing a critical mass of its disabled children. This reading also comports with the standard for returning special education to a school district. And it lets the Department intervene when a district is failing most of its disabled children while giving breathing room to blameless districts that find themselves failing their disabled children. The Department's first argument does not change the Court's conclusion.

Second, the Department states that it has "absolutely no control over the management or operation of any KCS school, including the school I.L. attended." [D. 29 at 17]. To a degree, the Department is right. Each local school board has a duty to "manage and control all public schools established or that may be established under its jurisdiction." TENN. CODE ANN. § 49-2-203(a)(2) (cleaned up). But the actual managerial tasks assigned to local school boards include giving teachers tenure, firing school employees, suspending students, and buying supplies. *Id.* § 49-2-203(a). School boards manage the day-to-day affairs and keep school districts running. The Department still has a duty to ensure that school districts follow federal and state law.

The Department next contends that Taylor has failed to state a claim because it was not deliberately indifferent to the District's disability discrimination. To prove her Title II and § 504 claim, Taylor must show that I.L. (1) is disabled under these laws; (2) is otherwise qualified to participate in public education; and (3) is suffering discrimination in public education based on her disability.

*S.S.*, 532 F.3d at 453.[6] The parties dispute the mindset required for the third element. The Department contends that Taylor must show deliberate indifference. Taylor maintains that, because she seeks only injunctive relief on her Title II and § 504 claim, she need not prove deliberate indifference.

Taylor is correct. This question has not been answered by the Sixth Circuit. It has appeared before the Sixth Circuit twice, but the parties agreed on an answer. *See R.K. ex rel. J.K. v. Bd. of Educ. of Scott Cty.*, 637 F. App'x 922, 925 (6th Cir. 2016); *Hill v. Bradley Cty. Bd. of Educ.*, 295 F. App'x 740, 742 & n.2 (6th Cir. 2008). So the Court will start from the beginning. *See* Mark C. Weber, *Accidentally on Purpose: Intent in Disability Discrimination Law*, 56 B.C. L. Rᴇᴠ. 1417 (2015).

The "remedies, procedures, and rights" of Title II are those of § 504. 42 U.S.C. § 12133. And the "remedies, procedures, and right" of § 504 are those of Tile VI of the Civil Rights Act. 29 U.S.C. § 794a(a)(2). But Title VI does not expressly allow people to sue for Title VI violations. Instead, it contains an implied right to sue. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 694–95, 702 (1979). So Title II and § 504 contain implied rights to sue for Title II and § 504 violations.

The next question is what kinds of Title II and § 504 violations people can sue over. *See Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 65–66 (1992). People can sue only for intentional violations of Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001). So one might think that people can sue only for intentional violations of Title II and § 504. Not so. While the Supreme Court has not outright said that § 504 covers unintentional discrimination, it has rejected the idea that § 504 covers only intentional discrimination. *Alexander v. Choate*, 469 U.S. 287, 294–97 (1985). And Title II, for its part, "concerns more than intentional discrimination." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 908 (6th Cir. 2004). Thus—despite the "remedies, procedures, and rights" language linking Title II, § 504, and Title VI—the first two diverge from Title VI at this point. They all contain an implied right to sue, but only Title II and § 504

---

[6] There are minor differences in the elements of a Title II claim and a § 504 claim, but they make no difference here. *See Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 n.4 (6th Cir. 1998); *Shaikh v. Lincoln Mem'l Univ.*, 46 F. Supp. 3d 775, 782 (E.D. Tenn. 2014) (Reeves, J.).

cover both intentional and unintentional discrimination. Title II and § 504 provide greater rights than does Title VI.

And there is no right without a remedy. *Sandoval*, 532 U.S. at 286–87. Title VI provides a right to sue. It thus makes remedies available for Title VI violations. *Barnes v. Gorman*, 536 U.S. 181, 189 (2002). Title VI's right to sue carries over into § 504 and Title II. So Title VI makes the same remedies available for Title II and § 504 violations. *Id.* These include injunctions and compensatory damages, but not punitive damages. *Id.* at 187, 189.

Of course, that certain remedies are available says nothing about what must be shown to obtain those remedies. The next question—the real question here—is what a plaintiff must show to win an injunction, and what she must show to win damages. *Barnes v. Gorman*, 536 U.S. 181 (2002), is instructive. In *Barnes*, the Supreme Court ruled that Title II and § 504 plaintiffs can win injunctions and compensatory damages but not punitive damages. *Id.* at 187, 189. The plaintiff had sued for failure to accommodate his disability. *Id.* at 184. The case was appealed from the Eighth Circuit. *Id.* At the time, the Eighth Circuit did not require proof of intent for failure-to-accommodate claims. *See, e.g.*, *Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 726–28 (8th Cir. 1999). So the *Barnes* court let a plaintiff recover damages under Title II and § 504 without proving intent.

In fact, *Barnes* did more than that. As the Court said,

> When a federal-funds recipient violates conditions of Spending Clause legislation, the wrong done is the failure to provide what the contractual obligation requires; and that wrong is "made good" when the recipient *compensates* the Federal Government or a third-party beneficiary (as in this case) for the loss caused by that failure.

536 U.S. at 189. The defendant had unintentionally violated the plaintiff's Title II and § 504 rights, and so had to make good the wrong done by giving him damages. This suggests that a plaintiff can recover damages under Title II and § 504 without proving intent. And because "intent may be inferred from deliberate indifference," it suggests that that a plaintiff can recover damages under Title II and § 504 without proving deliberate indifference. *Hill*, 295 F. App'x at 742; *see also*

*Ability Ctr.*, 385 F.3d at 909 ("Title II prohibits public entities from denying, even unintentionally, qualified disabled individuals meaningful access to the services or benefits they provide.").

It follows that a plaintiff can win an injunction under Title II and § 504 without proving intent. Intent does not separate injunctions from damages. What really separates them is that injunctions may be awarded when damages would not be adequate to make up for the plaintiff's harm. *See, e.g.*, *Barry v. Lyon*, 834 F.3d 706, 720–21 (6th Cir. 2016). "Adequacy," meanwhile, "does not depend on a party's ability to prevail on the merits." *Rimmer v. Holder*, 700 F.3d 246, 262 (6th Cir. 2012). What a plaintiff must prove at the merits stage is independent of what she must prove at the remedies stage.

And that is the key here: *at the remedies stage*. Eight courts of appeals require that a plaintiff prove some mental state before winning damages under Title II and § 504.[7] The reasoning goes like this: The remedies under Title VI are the same as those under Title II and § 504. And the Supreme Court has twice recognized that Title VI plaintiffs can recover damages only for intentional discrimination. *Guardians Ass'n v. Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 608 n.1 (1983) (Powell, J., concurring in the judgment); *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001) (discussing *Guardians*). Thus, Title II and § 504 plaintiffs can recover damages only for intentional discrimination.

This reasoning, however, reads *Guardians* and *Sandoval* too narrowly. True, the Court did hold that intentional discrimination is required for damages under Title VI. *See Sandoval*, 532 U.S. at 282–83. But the Court held that intentional discrimination is required for *any* remedy under Title VI, as Title VI protects against only intentional discrimination. *Id.* at 280. So a Title VI plaintiff must prove intentional discrimination to win on the merits, not to get a specific remedy. And by

---

[7] *See, e.g.*, *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 126 & n.20 (1st Cir. 2003); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261–62 (3d Cir. 2013); *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 575 (5th Cir. 2002); *Meagley v. City of Little Rock*, 639 F.3d 384, 388–89 (8th Cir. 2011); *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1138 & n.12 (9th Cir. 2001); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152–53 (10th Cir. 1999); *Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992). In the other five courts of appeals it remains an open question. *See Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 373 (D. Md. 2011); *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 n.4 (7th Cir. 2014); *Pierce v. Dist. of Columbia*, 129 F. Supp. 3d 250, 278 (D.D.C. 2015).

reading *Sandoval* and *Guardians* too narrowly, courts have taken this element of a Title VI claim and made it the standard for Title VI damages. So these courts now say that intentional discrimination is the standard for Title II and § 504 damages. But the Sixth Circuit has not said so, and neither will the Court.

There is nothing to indicate that a plaintiff must ever prove intentional discrimination—or deliberate indifference—under Title II and § 504. What's more, the Supreme Court has upheld a damages award in a Title II case involving no intent element. And while eight courts of appeals require some mental state before awarding damages under Title II and § 504, these decisions have misconstrued Supreme Court case law. *See* Weber, *supra*. Taylor need not show that the Department of Education acted with deliberate indifference to win damages. So she need not show it to win an injunction. Taylor has stated a plausible claim for an injunction under Title II and § 504.

*     *     *     *     *

Taylor did not have to exhaust the IDEA's grievance procedure before suing the Department of Education. But because her claim for IDEA grievance-procedure interference was brought under the IDEA itself, the Department's motion to dismiss is granted on this claim. On all other claims, the Department's motion is denied.

### III

The Department of Education has also moved for summary judgment on Taylor's claims. It restates its exhaustion argument and contends that no reasonable jury could find for Taylor. As already explained, Taylor did not have to exhaust the IDEA's grievance procedure before suing the Department. But no reasonable jury could find for Taylor on her claims against the Department under the IDEA, the Supports Act, and Title II and § 504. The Department's motion will be granted.

### A

Summary judgment is proper only if there is no genuine dispute on any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is genuine if a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248

(1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*; *Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 847 (6th Cir. 2016).

The moving party bears the initial burden of showing that there is no genuine issue of material fact on any element of the other party's claim. *Stiles*, 819 F.3d at 847. In determining whether this burden is satisfied, the Court views all evidence in the light most favorable to the nonmoving party and draws all inferences in her favor. *Anderson*, 477 U.S. at 255. If the movant satisfies this burden, then the nomoving party must identify facts in the record that raise a genuine issue of material fact on each challenged element of her claim. *Stiles*, 819 F.3d at 847. If this is not done, summary judgment is granted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Court does not weigh evidence, judge witnesses' credibility, or decide the truth of the matter. *Anderson*, 477 U.S. at 249.

**B**

**1**

The Department of Education starts by restating the exhaustion argument made in its motion to dismiss. It also contends that Taylor had to exhaust the IDEA's grievance procedure because she did not actually allege systemic IDEA violations. But the Court has already held that Taylor did not need to exhaust the IDEA's grievance procedure against the Department. *Supra* Subsection II.B.1. So the Court will turn to the Department's remaining arguments.

**2**

Taylor alleges two kinds of misconduct under the IDEA. First, she alleges that the Department failed to hold Knox County Schools to its duty to educate disabled children in the least-restrictive environment. Second, she asserts that the Department failed to carry out its duties under the Supports Act. Taylor also alleges that the Department's deliberate indifference to the District's IDEA violations went against Title II and § 504. No reasonable jury could find for Taylor on these claims.

**(i) Taylor Has Not Shown a Genuine Dispute on Her Least-Restrictive-Environment Claim**

Taylor has not shown that the Department failed to hold Knox County Schools to the IDEA's least-restrictive-environment requirement. Generally, schools must teach disabled children in the regular class, also called "mainstreaming." *See* 20 U.S.C. § 1412(a)(5); *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 863 (6th Cir. 2004). Taylor alleges that the District systemically failed to properly mainstream its disabled students during the 2012–2013 school year. And the Department, she asserts, should have done more to prevent and correct this systemic failure.

Taylor, however, has not shown that the District systemically failed its disabled students during the 2012–2013 school year. There are tests for whether a disabled child is being taught in the least-restrictive environment, but none yet for whether a school district's disabled children are being taught in the least-restrictive environment. But a systemic test can be found in the single-student tests.

The first candidate is the test from *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058 (6th Cir. 1983). *Roncker* lists three instances when a school can remove a disabled child from the regular class: when the child would not benefit from regular education; when any regular-class benefits would be far outweighed by the benefits of special education; and when the child would be a disruptive force in the regular class. *Id.* at 1063. These three instances, however, are highly focused on a single child. None would apply to systemic claims.

Next is the Ninth Circuit's four-factor test. *See Sacramento Unified Sch. Dist. v. Rachel H. ex rel. Holland*, 14 F.3d 1398 (9th Cir. 1994). It looks at the following:

• the educational benefits available to the disabled child in a regular classroom supplemented with aids and services, as compared to the benefits of special education;

• the nonacademic benefits of interaction with nondisabled children;

• the effect of the disabled child's presence on the teacher and classmates; and

• the cost of teaching the child in the regular class.

*Id.* at 1400–01. These factors are also too child-specific to be used on a system-wide scale.

That leaves the popular test created by the Fifth Circuit in *Daniel R.R. v. State Board of Education*, 874 F.2d 1036 (5th Cir. 1989).[8] First, the court asks "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Id.* at 1048. If not, and the school intends to remove the child from the regular class, then the court asks "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* This second question is too individualized for systemic IDEA claims.

That leaves the first prong of the *Daniel R.R.* test. It lists three factors for the court to consider:

• whether the district has made reasonable efforts to mainstream the child;

• the educational benefits available to the child in regular class with supplements; and

• the possible negative effects on the other students of including the child.

*Id.* Again, the last two factors are too child-specific for systemic claims. That leaves the first factor. And it is easy to expand this factor to an entire district: A school district systemically fails to educate its disabled students in the least-restrictive environment when it does not make reasonable efforts under the circumstances to mainstream them.

Taylor focuses heavily on the outcomes of whatever mainstreaming efforts Knox County Schools has made. But the focus here must be on efforts, not outcomes. Consider a school district that makes heroic efforts to mainstream its disabled students but still falls short. Maybe the district is impoverished and cannot afford enough special-education staff. A systemic suit would be unable to fix this problem. Damages are not available for IDEA violations. *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 980 F.2d 382, 386 (6th Cir. 1992). So there are only two remedies: an injunction against the school district, or moving the child to private school and seeking reimbursement. *See id.* An injunction ordering the district to make greater mainstreaming efforts would do no good, because the district is already trying its best. Or an injunction might burden the district so much as to be against the public interest. *See Winter v. NRDC*, 555 U.S. 7, 24 (2008). And because the cost of private schooling varies by school and grade, reimbursement is best left to individual-child

---

[8] The Third Circuit adopted this test in *Oberti ex rel. Oberti v. Board of Education of Clementon School District*, 995 F.2d 1204, 1215–18 (3d Cir. 1993). The ALJ in I.L.'s due-process hearing applied *Oberti*.

claims. *See* 20 U.S.C. § 1412(a)(10)(C)(ii)–(iii). A school district that strives to mainstream its students might be liable for many individual IDEA violations. But it would not be liable for one systemic IDEA violation.

Consider also the opposite: a school district that makes no efforts to mainstream its disabled students but still somehow properly mainstreams them. Maybe the district does not even offer special education, instead educating all disabled students in the regular class with supplements. If many of the students actually need special education, then it seems like there would be a systemic IDEA violation. And there might be one. But there would be no IDEA violation for failing to *mainstream*. Instead, there might be a systemic violation for failing to offer a FAPE. Ultimately, it's a balancing act. Schools must offer their disabled students a FAPE in the least-restrictive environment. If there is too much mainstreaming, there might be denials of a FAPE. But if there is too little mainstreaming, there might be denials of a least-restrictive environment. An efforts-focused standard acknowledges the realities of trying to strike this balance.

And an efforts-focused standard based on reasonableness is more appropriate than an efforts-focused standard based on a rigid benchmark. A reasonableness standard fits the structural nature of systemic claims. A systemic claim "implicates the integrity or reliability of the IDEA dispute resolution procedures, or requires restructuring the education system in itself." *Doe ex rel. Brockhuis v. Ariz. Dep't of Educ.*, 111 F.3d 678, 682 (9th Cir. 1997). Yet courts should not rush to restructure how a school district handles disabled students. Compliance with the IDEA and its regulations requires "expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches." *Procunier v. Martinez*, 416 U.S. 396, 405 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989). As a result, "courts are ill equipped to deal with" the structural complexities of IDEA administration. *Id.* A reasonableness standard respects the expertise of departments of education and school districts, and it allows courts to stay out of structural disputes until there is a truly structural problem.

A reasonableness standard also reflects the realities of IDEA administration. The IDEA and its regulations spin "a complex web of statutory provisions and DOE regulations." *Davis ex rel. La-Shonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 666 (1999). So school systems will sometimes stray off course. But that does not mean that a court should get involved. That's why, procedurally, courts cannot give relief for IDEA violations that are merely technical. *Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999). And that's why, substantively, an IEP need only be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). A reasonableness standard for single-student claims gives school districts breathing room to serve their disabled students without constant fear of liability. A reasonableness standard for systemic claims does too.

Taylor contends that the Court should require strict compliance with the IDEA. But the reasons for a reasonableness standard are reasons against strict compliance. The Court will not hold Knox County Schools to such a high bar. Instead, the question is whether the District made reasonable efforts to mainstream its disabled students during the 2012–2013 school year.

No reasonable jury could answer "no." Taylor leans most of her argument on the District's failure to meet any 2012–2013 federal least-restrictive-environment benchmarks. Hr'g Tr. Ex. 21. But she offers no evidence of how far Knox County Schools fell short. Nor does she offer any other data from the 2012–2013 school year or prior years. And the Court will not comb through the 3000-page administrative record to find support for Taylor's claim. FED. R. CIV. P. 56(c)(3); *see United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."). Taylor has not given the Court any way to contextualize the data she offers. So the District's failure to meet federal 2012–2013 benchmarks does not show a genuine dispute of material fact on Taylor's claim.

Taylor also notes that Knox County Schools admitted to ability grouping its special-education students. Ability grouping groups students into tiers based on learning capacity and teaches each tier in a different way. James E. Ryan, *Poverty as Disability and the Future of Special Education*

*Law*, 101 GEO. L.J. 1455, 1475 (2013). The IDEA implicitly allows ability grouping for disabled students. *See* 20 U.S.C. §§ 1414(b)(6)(B), 1401(30). But, of course, ability grouping under the IDEA cannot violate the mainstreaming requirement. So what matters is whether the District's practice of ability grouping its special-education students systemically denied them an education in the least-restrictive environment during the 2012–2013 school year.

No reasonable jury could find that it did. The only evidence Taylor offers is the District's admission that it ability groups disabled students. She highlights one passage, in which a Knox County attorney stated,

> But what Knox County says is "We want to group our children um in small learning groups, so they're learning like each other." So, if I have this ability and my peer who's also Special Ed has that ability, we're grouped together in a location. Okay? And we're taught by a Special Ed teacher (Okay?).
>
> …
>
> By law, he is a resource student. Now, Knox County students are now grouped according to small group. So, kids that are alike – just like reading groups are children reading at like level – special ed students are groups according to alike. And so they are taught by a special ed teacher. So his service of the special ed is not in the location. He is a resource student taught by a special education teacher.

[D. 94 Ex. 6 at 3–4]. All this passage says is that Knox County Schools ability groups disabled students. It says nothing about whether this grouping cuts into time that disabled students should be spending in the regular classroom. The District's admission does not create a genuine dispute about whether it is systemically failing to mainstream its disabled students.

Taylor has not shown a genuine dispute about whether Knox County Schools systemically violated the IDEA's least-restrictive-environment requirement during the 2012–2013 school year. So she has not shown a genuine dispute on her claim that the Department of Education failed to enforce the requirement against Knox County Schools.

### (ii) Taylor Has Not Shown a Genuine Dispute on Her Supports Act Claims

Taylor also alleges that the Department itself is breaking the law by not upholding its duties under the Supports Act. She levels two claims here. First, she claims that the Department failed to properly report data to the state Advisory Council, a body composed of parents, teachers, and education officials that advises the Department and the board of education on special-education policy. TENN. CODE ANN. § 49-10-105. Taylor says that the Department failed to properly report in two ways: the data were not broken down by school district; and the data were too muddled to conclude that any district had violated the Supports Act. Second, she claims that the Department failed to provide proper guidance to school districts about isolating and restraining disabled students.

Taylor has not shown a genuine dispute on these claims. First, no jury could find that the Department failed to properly collect and report data. Taylor cites only a deposition excerpt from another case, *N.S. ex rel. J.S. v. Tennessee Department of Education*, No. 3:16-cv-610, 2016 WL 3763264 (M.D. Tenn. July 14, 2016). The deponent is Chip Fair, chairman of the state Advisory Council. He explains what kind of data the Advisory Council receives from the Department of Education.

This deposition excerpt does not create a genuine dispute on Taylor's claim that the Department failed to collect and report data. Right off the bat, Taylor cites fourteen pages from the Fair deposition, yet the excerpt in the record contains only the cover and pages 31, 32, and 48. A party overcomes summary judgment by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c)(1)(A). So the Court will not consider any statements backed by a citation not in the record.

The remaining pages do not create a genuine dispute. The Fair excerpts do not even hint at who provided the isolation and restraint data to the Advisory Council. So no jury could find that the Department provided this information. Nor could a jury find that whatever information the Department provided was shoddy. Taylor has not offered enough evidence to survive summary judgment on this claim.

The same goes for her claim that the Department failed to offer guidance to school districts about isolations and restraints. Again, Taylor cites only one deposition excerpt. This excerpt is from Alison Gauld, a Department employee who discusses failed efforts to create an isolations-and-restraints task force. But again, Taylor cites four pages from the deposition, yet provided only the cover and page 21. And page 21 does not create a genuine dispute on this claim. It shows only that the task force was working on some sort of Q&A document. No reasonable jury could read this excerpt and find for Taylor.

There is also a second problem with this claim. According to Taylor, I.L. was harmed by the gym-mat fencings. These fencings came from a systemic failure by Knox County Schools to train its staff in lawfully isolating disabled students. And this systemic failure came from the Department's failure to report and supervise, as it must under the Supports Act. Thus, Taylor concludes, the Department of Education systemically violated the Supports Act. But as explained above, Taylor has not shown systemic failures by Knox County Schools. She has not shown a genuine dispute on either of her Supports Act claims against the Department.

### (iii) Taylor Has Not Shown a Genuine Dispute on Her Title II and § 504 Claim

Finally, Taylor alleges that the Department violated Title II and § 504 by being deliberately indifferent to the District's IDEA violations. The Department counters that the District did not violate the IDEA, so the Department did not run afoul of Title II and § 504.

For a different reason, this claim does not survive summary judgment. At the outset, dismissing the IDEA claims against the District would not require the Court to dismiss the Title II and § 504 claim against the Department. The Department makes much of the fact that, when IDEA claims have been dismissed, courts have dismissed related Title II and § 504 claims. But this occurs only when the IDEA claims allege the denial of a FAPE. *See, e.g.*, *N.L. ex rel. Mrs. C. v. Knox Cty. Sch.*, 315 F.3d 688, 695–96 (6th Cir. 2003). Taylor's Title II and § 504 claim is based on allegations that the District denied I.L. the least-restrictive environment, not a FAPE. So the Court need not consider here whether Knox County Schools violated the IDEA.

Even still, no reasonable jury could find that the Department violated Title II and § 504. To win on her claim, Taylor must show that I.L. (1) is disabled; (2) is otherwise qualified to participate in the regular class; and (3) was excluded from the regular class because of her disability. *See, e.g.*, *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998). But as the Department points out, Taylor has offered no evidence whatsoever on these elements. She has thus failed to show a genuine dispute on her Title II and § 504 claim. Her claims against the Tennessee Department of Education will be dismissed.

## IV

Next, Taylor moves for summary judgment against the Department on her claim of IDEA grievance-procedure interference. But because she brought this claim under the IDEA, it must be dismissed. *Supra* Subsection II.B.2.i. Taylor's motion for partial summary judgment will therefore be denied.

## V

The Department responded to Taylor's motion by filing a countermotion for summary judgment on her claim of grievance-procedure interference. But this claim is already being dismissed. So the Department's motion will be denied as moot.

## VI

Taylor also moves for judgment on the administrative record against Knox County Schools. But first, the Court must address an evidentiary dispute. Taylor submitted an interrogatory to the Department of Education. It asked if the Department agreed with the ALJ that the gym-mat fencings violated the Supports Act. The Department answered that it agreed. Taylor now seeks to use this answer as evidence that Knox County Schools violated the Supports Act. Knox County Schools seeks to strike the answer.

The Court will not consider the interrogatory answer. "An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact . . . ." FED. R. CIV. P. 32(a)(2). So parties can serve interrogatories asking for these opinions

or contentions, known as *contention interrogatories*. They "are interrogatories that seek to clarify the basis for or scope of an adversary's legal claim." *Starcher v. Corr. Med. Sys., Inc.*, 144 F.3d 418, 421 n.2 (6th Cir. 1998), *aff'd sub nom. Cunningham v. Hamilton Cty.*, 527 U.S. 198 (1999). Knox County Schools maintains that the Department is a separate entity and so cannot speak for it. It also asserts that the Department's answer lacks foundation and should be rejected.

The Court agrees with the first argument. The IDEA views state departments of education and local school districts as separate entities. *See* 20 U.SC. § 1401(19), (32). Tennessee law does too. *S. Constructors, Inc. v. Loudon Cty. Bd. of Educ.*, 58 S.W.3d 706, 715 & n.10 (Tenn. 2001). Indeed, if Knox County Schools were part of the Department of Education, then Taylor would have had to exhaust the IDEA's grievance procedure against the Department. And as Taylor notes, the Department can pull funding from school districts that violate the IDEA. Tenn. Code Ann. § 49-10-109(a)(1); 34 C.F.R. § 300.604(b)(2)(v). It makes no conceptual sense for an entity to pull funding from itself while still holding onto the funds. The Department is legally distinct from the District, so it was not an adversary in the state grievance procedure. Its answer to Taylor's interrogatory cannot be used against the District.

Taylor counters that, under the IDEA, the Department reigns over the District. The Department alone enforces the Act, she asserts, so it alone may interpret the Act. But there are three problems with this argument. First, it ignores the fact that school districts are charged with implementing the IDEA. *See, e.g.*, 20 U.S.C. § 1414(d)(1)(B)(ii)–(iv). Second, it ignores the existence of the U.S. Department of Education. The Tennessee Department of Education may have authority over local school districts—but the U.S. Department of Education has the same authority over its Tennessee counterpart. *See* 34 C.F.R. §§ 300.604, 300.600(a)(3). By Taylor's logic, the Tennessee Department of Education would merely be part of the federal one, rather than a separate entity. Finally, Taylor's argument presumes that agency interpretations of law are per se conclusive. But while they may deserve deference, agency interpretations are never just accepted at face value. *See*

*United States v. Mead Corp.*, 533 U.S. 218, 227–28 (2001). The Tennessee Department of Education cannot bind its school systems to a position in litigation. Its interrogatory answer has no bearing on the District.

Taylor's motion to admit that answer will therefore be denied. Because it will be denied, there is no reason for the Court to strike it. So the District's motion to strike the answer will be denied as moot.

## VII

The Court can now consider the motions for judgment on the administrative record filed by Taylor and Knox County Schools. In the due-process proceedings, the ALJ found that Knox County Schools was not denying I.L. a FAPE in the least-restrictive environment. He did however find that its gym-mat fencings violated the Supports Act. Taylor now asks the Court to overturn the first judgment and uphold the second, and Knox County Schools requests the opposite. For the following reasons, the Court rules for Knox County Schools on the least-restrictive-environment claims, rules for Taylor on the Supports Act claim, and orders remedies.

## A

First, the facts. While there is a facts section above, that section was simply meant to frame the issues in this suit. By contrast, when judging an IDEA case on the administrative record, the Court must "make findings of fact based on a preponderance of the evidence in the complete record." *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001). So the Court will restate the facts as they appear in the record.

I.L. is a child with Down syndrome and is "disabled" under the IDEA. She first lived within the area of Knox County Schools. When I.L. entered preschool in 2007 at age three, the school gave her special education four days a week for 3.5 hours a day. I.L. missed 37 days of school.

The next year, Taylor homeschooled I.L. for pre-K.

In 2009, I.L. began kindergarten at a Knox County school. Taylor and the school agreed on an IEP, but Taylor pulled I.L. from the school after 21 days. I.L. was homeschooled for the rest of the year.

Taylor continued to homeschool I.L. during first grade, 2009–2010.

The next year, I.L. repeated first grade. She learned through the Tennessee Virtual Academy, an online public school offered by Union County, Tennessee. I.L. did not have an IEP.

I.L. began second grade in 2012, this time in Hamilton County. Here too, school officials recommended an IEP with some daily special education. So in December, Taylor pulled I.L. and went back to the Virtual Academy. Taylor and the Academy's IEP team formed an IEP—the Virtual Academy IEP—that set 6 educational goals for I.L. It also prescribed one hour of special education over the four-day week. The IEP did not include a behavior intervention plan, a plan to use positive interventions when a child's behavior impedes her learning or others'. 20 U.S.C. § 1414(d)(3)(B)(i).

In 2013, I.L. repeated second grade at the Virtual Academy. Her IEP was changed to include two hours of weekly special education.

In 2014, I.L. started third grade at West Hills Elementary School, a Knox County school. Her regular class was taught by Kari Matthews. Taylor and the school formed the West Hills IEP, which was simply the Virtual Academy IEP with minor changes reflecting West Hills's brick-and-mortar schooling and five-day school week. As a result, I.L. was to receive 20 minutes of special education a day. She was also to be aided by a paraprofessional.

I.L. received a paraprofessional. But because West Hills had not yet hired someone full time for I.L., the school's other paraprofessionals and assistants filled in. I.L. thus had nine paraprofessionals or assistants during her one month at West Hills.

I.L. acted out constantly in class. She would scream expletives like "big titties" and "big anus." She called her black paraprofessional "big chocolate." She grabbed Matthews in the groin so hard that she left a bruise. She would grope, hit, and spit on teachers and classmates. I.L.'s behavior was so extreme that several parents removed their children from the class.

Matthews strove for a solution. She rearranged the seating, rearranged the room, gave I.L. awards for good behavior, scaled down the classwork so I.L. wouldn't get frustrated, gave her special tools to do her work, and more. Nothing worked.

But I.L.'s IEP team was determined to pin down the sources of, and solutions to, her behavioral issues. So on September 12, 2014, Taylor allowed the school to conduct a functional behavioral assessment. 34 C.F.R. § 300.530(d)(1)(ii). A functional behavioral assessment results in a behavior intervention plan. *See Zdrowski v. Rieck*, 119 F. Supp. 3d 643, 671 (E.D. Mich. 2015). This plan is then used to teach a child good behavior. *Id.*

On September 17—five days after consenting to the behavioral assessment and after 26 days of school—Taylor pulled I.L. from West Hills.[9] The parties dispute why: Taylor says it was because someone reported her to child services, and she suspects it was someone at West Hills. The District says it was because Taylor disagreed with proposed changes to I.L.'s IEP. Either way, functional behavioral assessments depend on data about how the child acts in the classroom. So West Hills could not conduct the assessment and find solutions to I.L.'s behavior.

Taylor moved and transferred I.L. to Brickey-McCloud Elementary School, also a Knox County school. Brickey-McCloud staff formed a new IEP team, which included some West Hills staff to help with the transition. The new IEP team met with Taylor several times over September–October 2014. I.L. stayed home until a new IEP was formed. By the end of third grade, I.L. had missed 70 days of school.

I.L. was not progressing as school officials had hoped, so the new IEP team worked with Taylor to form a new IEP. *See* 20 U.S.C. § 1414(d)(4)(A)(ii)(I). All agreed that the six goals in the West Hills IEP were too hard for I.L., so they were replaced by 13 new goals. But the IEP team felt that

---

[9] Knox County Schools criticized Taylor's statement of facts, calling it "a gross mischaracterization of the testimony" and a "deliberate misstatement of the ALJ's conclusions of law." [D. 54 at 5]. "Most egregiously," it continued, "Plaintiffs have intentionally taken portions of the testimony of key witnesses . . . and misquoted these witnesses out of context in an obvious attempt to undermine the opinion of the ALJ." [*Id.* at 6]. Taylor responded by accurately calling this criticism "unprofessional." [D. 47 at 2]. But then Taylor went on to say that one of the District's arguments "offends the common sense of even the smallest minds." [*Id.*]. This is no better. And Taylor also deemed the District's criticism "inaccurate." [*Id.*]. Yet Taylor herself, in restating "key dates," did not include the noteworthy September 17 pullout. [*Id.* at 2–3].

I.L. could not achieve the 13 goals with only 20 minutes of special education a day. So the team recommended that I.L. receive four hours a day.

Taylor, though, would not bend. She declared that she was done with the meeting and demanded prior written notice, which a school system must give a parent when it decides to change an IEP. 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a). The District gave notice on November 4, 2014. Taylor felt like she now had only two options: accept the IEP described in the prior written notice, or reject it.

Taylor rejected it. On November 17, I.L. started third grade at Brickey-McCloud—and Taylor filed the first due-process complaint. Filing a due-process complaint triggers the IDEA's stay-put provision, keeping things as they are until the dispute is over. 20 U.S.C. § 1415(j); 34 C.F.R. § 300.518(a). As a result, Brickey-McCloud was forced to teach I.L. under the West Hills IEP, with the six goals and 20 minutes of daily special education.

This also included a paraprofessional. But when I.L. started at Brickey-McCloud, there was no paraprofessional to assign specifically to I.L. So while the school sought someone for the spot, other paraprofessionals filled in. I.L. thus had five paraprofessionals over the rest of the school year.

I.L. continued to act out in class. In one instance, she hit her special-education teacher over fifty times in a day. In another, she threw scissors across the classroom, striking a classmate in the face. Once again, parents removed their children from the class because of I.L.'s behavior. And despite the efforts made by I.L.'s regular-class teacher, nothing worked. So as at West Hills, I.L.'s IEP team decided to find a solution.

Fortunately, the school did not have seek Taylor's consent for a functional behavioral assessment, as Taylor's consent to the West Hills assessment carried over to Brickey-McCloud. Kelton Sweet, Brickey-McCloud's behavioral liaison, began observing I.L. in December. This culminated in a draft functional behavioral assessment and draft behavior intervention plan. With these drafts in hand, the IEP team and Taylor met four times over January–February 2015 to hammer out a new IEP.

They failed. The reason was not new: the school wanted to give I.L. four hours of special education a day, while Taylor insisted on the 20 minutes. The final meeting was on February 5, 2015. As the meeting progressed, things grew heated. Taylor would not accept the functional behavioral assessment or the behavior intervention plan unless I.L.'s six goals were replaced with the 13 goals proposed at West Hills. But the IEP team would not accept the 13 goals unless they could be taught through more special education. Yet Taylor would not accept more special education. The meeting ended in tears.

No further meetings took place. Taylor pushes the theory that no more meetings happened because the IEP team was "too miserable." In reality, none occurred because the team thought it would be pointless. I.L. continued to be taught under the West Hills IEP.

Fourth grade arrived in August 2015. I.L. lasted four days. During those four days I.L.'s behavioral problems repeated themselves, so Brickey-McCloud staff tried a new technique. When I.L. was having an outburst, staff would walk I.L. out of class and down the hall, to an alcove formed by the entryway to an empty classroom. They would sit I.L. in a chair in an alcove, then use a thin blue gym mat to close off the alcove and create a 4′×4′ fence, which I.L. would sit in until she calmed down. The fencings lasted a total of four hours. Members of I.L.'s IEP team knew of this practice.

When Taylor learned of the fencings, she pulled I.L. from Brickey-McCloud. The second due-process complaint followed on August 20, 2015. Taylor went back to homeschooling I.L.

## B

After the ALJ rules on a party's due-process complaint, either party may seek judicial review of the ruling. 20 U.S.C. § 1415(i)(2)(A). The court must reexamine the evidence from the hearing and can receive new evidence. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004). It must also defer to the ALJ's factual findings when "educational expertise is relevant to those findings and the decision is reasonable." *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*,

208 F.3d 560, 567 (6th Cir. 2000). The court must then make decision based on the preponderance of the evidence. *Deal*, 392 F.3d at 849.

C

Taylor alleges that Knox County Schools committed six procedural IDEA violations, one substantive IDEA violation, and one Supports Act violation. The Court finds no IDEA violations, but it finds that the District violated the Supports Act.

1

First, Taylor claims that Knox County Schools violated the IDEA's procedural requirements when forming and implementing I.L.'s IEP. The Court must "strictly review an IEP for procedural compliance," though "technical deviations do not render an IEP invalid." *Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999). Instead, relief can be granted for procedural violations only if they deny the child a FAPE. *Deal*, 392 F.3d at 854; *see also* 20 U.S.C. § 1415(f)(3)(E)(ii).

Taylor alleges six procedural violations by Knox County Schools. It decided that I.L. needed more special education without first (1) trying behavioral supports in the regular class; (2) placing I.L. in a resource room; (3) giving I.L. a consistent paraprofessional in the regular class; or (4) setting appropriate goals. The District also never provided a teacher willing to teach I.L. according to her IEP. And it used the wrong standards when measuring I.L.'s classroom progress. None of these allegations holds up.

**(i) The District Had No Duty to Try Behavioral Supports or Place I.L. in a Resource Room**

According to Taylor, Knox County Schools decided that I.L. needed four hours of daily special education before trying less drastic options. First, she claims that the schools should have given I.L. more behavioral supports while she was in the regular class. Second, she claims that the schools should have supplemented I.L.'s regular-class time with a resource room, a separate classroom where disabled students learn the regular curriculum in a more individualized setting. *See,*

*e.g.*, *Oberti ex rel. Oberti v. Bd. of Educ. of Clementon Sch. Dist.*, 995 F.2d 1204, 1216 n.22 (3d Cir. 1993).

The District had no duty to try these options. Taylor leans her argument on the IDEA regulation requiring that school districts have a continuum of alternative placements. 34 C.F.R. § 300.115. It moves from the least-restrictive environment—a regular class with no supports—to the most restrictive—instruction in a hospital or institution. Taylor reasons that, because there is a continuum, schools must start at the least-restrictive option and move up one step at a time.

Not so. "The regulations do not require that a child has to fail in the less restrictive options on the continuum before that child can be placed in a setting that is appropriate to his or her needs." Assistance to the States for the Education of Children with Disabilities, 64 Fed. Reg. 12,406, 12,638 (U.S. Dep't of Educ. Mar. 12, 1999) (discussing now-§ 300.115) [hereinafter Assistance to the States]. Instead, schools must simply make sure that disabled students are educated with nondisabled students to "the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A).

To be sure, disabled students cannot be removed from regular classes unless "the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* But this does not say that schools must actually try supplementary aids and services before removing children from regular classes. Instead, the IEP team must simply look into whether supplements could be used instead of separate schooling. U.S. Office of Special Educ., Letter to Estavan, 25 IDELR 1211 (Feb. 7, 1997). The West Hills staff tried countless supplementary aids and services for I.L. Hr'g Tr. at 869:24–879:21, 1100:16–1107:2, Ex. 59. West Hills met its burden, and the Brickey-McCloud team built on what West Hills staff learned. I.L.'s IEP teams did not violate the IDEA by going straight to proposing four hours of special education a day.

### (ii) The Lack of a Consistent Paraprofessional Did Not Violate the IDEA

Next, Taylor contends that the schools should have had a dedicated paraprofessional for I.L. the day she walked in the door. West Hills and Brickey-McCloud eventually hired a full-time paraprofessional for I.L., but they did not have one ready on I.L.'s first day at each school. Taylor asserts that this violated the IDEA.

The Court disagrees. "As soon as possible following the development of an IEP," schools must ensure that "special education and related services are made available to the child in accordance with the child's IEP." 34 C.F.R. § 300.323(c)(2); *see also* TENN. COMP. R. & REGS. 0520-01-09-.13. "As soon as possible" means "without undue delay." Assistance to the States, 64 Fed. Reg. at 12,579; *see U.S. ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 763 (6th Cir. 2016). There were delays at both West Hills and Brickey-McCloud between when the schools learned that they had to hire a paraprofessional for I.L. and when I.L. received her full-time paraprofessional. The question is whether these delays were undue.

They were not. A short delay is acceptable when the school must hire someone. Assistance to the States, 64 Fed. Reg. at 12,579. West Hills learned of the need to hire a paraprofessional on August 11 or 12, 2014. School started on August 12. West Hills hired a paraprofessional within two weeks and trained her in three, and then she started working with I.L. Given all that goes into hiring and training a paraprofessional, along with the one-day notice West Hills had, this is not an undue delay. *See Bd. of Educ. of Montgomery Cty. v. Brett Y*, 155 F.3d 557, at *10 (4th Cir. 1998) (unpublished) (deeming a 30-day delay "well within" the meaning of "as soon as possible").

Nor was there an undue delay at Brickey-McCloud. I.L. started school there on November 17, the day that Taylor filed the first due-process complaint. When she filed that complaint, Brickey-McCloud learned that the West Hills IEP would remain in effect. November 17 is thus when Brickey-McCloud learned of its need to hire a paraprofessional for I.L. And while the record is sparse about what follows, it does reveal the following:

- Before Brickey-McCloud hired someone for I.L., she had five paraprofessionals assigned to her. Hr'g Tr. at 518:7–10.

47

- Of those five, one was "consistent as far as totally being assigned to her." *Id.* at 529:25–530:1.

- Over a few days in March, however, some of the paraprofessionals were sick, and one had stopped working at Brickey-McCloud altogether. Cunningham Dep. at 29:8–16; Hr'g Tr. at 531:11–21.

- Sometime between March and the end of the school year in May, Brickey-McCloud hired two paraprofessionals for I.L., and they started working with her. Hr'g Tr. at 258:18–259:1, 530:23–531:7.

So while I.L. may have had five paraprofessionals at Brickey-McCloud, that number counts those who filled in during a rough patch in March. And I.L. actually had a consistent paraprofessional most of the time, even if one was not hired specifically for I.L. until later. The evidence reveals no delay in getting I.L. a consistent paraprofessional at Brickey-McCloud, much less an undue delay. Knox County Schools did not violate the IDEA in this respect.

### (iii) The Failure to Implement the 13 Goals Did Not Deny I.L. a FAPE

In fall 2014, Taylor and the Brickey-McCloud IEP team agreed to replace I.L.'s six educational goals with 13 more feasible ones. But the IEP team also insisted that these goals could not be achieved without extra special education. So it offered the two IEP changes—new goals and more special education—as a package deal. Taylor turned down the deal. And this scenario played out again in early 2015. Taylor maintains that, regardless of the special-education roadblock, the 13 goals should have been implemented.

Taylor is correct. "A public agency may not use a parent's refusal to consent to one service or activity . . . to deny the parent or child any other service, benefit, or activity of the public agency, except as required by this part." 34 C.F.R. § 300.300(d)(3); *see also* Assistance to the States, 64 Fed. Reg. at 12,610–11. Taylor refused to consent to extra special education, but she agreed to the

13 goals. And nothing in the IDEA allowed the school to refrain from implementing one just because Taylor rejected the other. Brickey-McCloud thus had a duty to implement the 13 goals. Its failure to do so amounts to a procedural IDEA violation.

But a plaintiff cannot recover for a procedural IDEA violation unless it denied the child a FAPE. *Deal*, 392 F.3d at 854. And refusing to implement the 13 goals did not deny I.L. a FAPE. An IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). So the question is whether I.L.'s IEP would have met this standard had it included the 13 goals and 20 minutes of daily special education. Taylor has the burden of proving that it would have.

Taylor has not met this burden. In the state proceedings, six witnesses offered an opinion about whether I.L. could make progress on the 13 goals with only 20 minutes of daily special education. Five said no, and one said yes. And the one that said yes could not speak about I.L. specifically.

First is Kari Matthews, I.L.'s regular-class teacher at West Hills. Hr'g Tr. at 1062:5–1199:15. She had taught with Knox County Schools for six years, and she had a child with Down syndrome in her class the year before I.L. When I.L. started in her class, Matthews sat I.L. with her nondisabled classmates in a group of four or five desks. But I.L. kept reaching past her desk and grabbing her neighbors, so Matthews moved I.L. to a desk island two feet away from the other students' desks, where she would sit with her assistant. Matthews designed the island with input from West Hills's special-education team, the special-education coordinator, the special-education supervisor, Matthews's supervisor, I.L.'s occupational therapist, and school administrators. But it did not help with I.L.'s behavior. This cycle repeated itself over and over: I.L. would act out, Matthews would seek input, Matthews would give I.L. an accommodation based on that input, and the accommodation would have little effect. Based on her experience with I.L., Matthews testified that—even without behavioral issues—I.L. could not make progress on the 13 goals without more special education. *Id.* 1192:8–14.

Next is Elena Smith, a case manager and special-education teacher at West Hills. *Id.* at 40:5–164:15. She has been trained in the behaviors of children with Down syndrome, has worked with

children with Down syndrome, and observed I.L. in the classroom. Smith helped modify the Virtual Academy and West Hills IEPs. She also provided training and materials to those who assisted I.L. in the regular class. Smith herself was often in the regular class to make sure that I.L.'s IEP was being followed. And I.L.'s 20 minutes of daily special education were with Smith. In Smith's opinion, I.L. could not achieve the 13 goals with only 20 minutes of special education a day. *Id.* at 162:20–163:12.

Third is Dr. Clovis Stair, Ph.D. *Id.* at 803:10–986:17. She holds a doctorate in counseling psychology with an emphasis on children and adolescents, and she had been with Knox County Schools since 1993. Stair has been admitted as an expert witness in court to testify on behalf of children. And she was admitted as an expert in I.L.'s due-process hearing. She worked for the District supervising psychological services, therapeutic social workers, and the special-education programming for elementary schools. She helped turn the Virtual Academy IEP into the West Hills IEP. She also observed I.L. in the classroom and helped out from time to time. Stair testified that, in her expert opinion, I.L.'s 13 goals could not be implemented with only 20 minutes of daily special education. *Id.* at 897:18–23, 938:15–18, 964:22–971:16.

Michelle Flynn offered a fourth opinion. *Id.* at 1215:3–1259:2. She has spent her career teaching disabled children, including those with Down syndrome. Flynn worked at Brickey-McCloud as a special-education supervisor. In that role, she oversaw the curriculum for disabled students, trained teachers, looked at individual students, and made sure that disabled students and their staffs had the supports they needed. She observed I.L. in the classroom and worked with the staff that regularly worked with I.L. Flynn said that, without more special education, I.L. could not benefit from regular education, regardless of her goals. *Id.* at 1228:11–25.

The last witness for Knox County Schools to testify on this issue was Dr. David Rostetter, Ed.D. *Id.* at 1265:14–1435:2. In I.L.'s due-process hearing, the ALJ admitted him as an expert in special education. In the 1980s he worked for the federal government, procuring experts to develop positive behavioral supports involving widespread implementation of functional behavioral as-

sessments. He also acted as special master in a class action involving the development of assessments and behavior intervention plans. And for a decade leading up to this suit, he was a professor of education, teaching courses on classroom management. Finally, Rostetter worked with the plaintiffs in cases that have appeared in this Order, such as *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058 (6th Cir. 1983), *Deal v. Hamilton County Board of Education*, 392 F.3d 840, 849 (6th Cir. 2004), *Daniel R.R. v. State Board of Education*, 874 F.2d 1036 (5th Cir. 1989), and *Oberti ex rel. Oberti v. Board of Education of Clementon School District*, 995 F.2d 1204 (3d Cir. 1993). To prepare for I.L.'s due-process hearing, Rostetter reviewed the due-process pleadings, reviewed I.L.'s school records and notes from the IEP meetings, interviewed staff at West Hills and Brickey-McCloud, and more. Based on all this experience and preparation, Rostetter gave a clear opinion: "the idea that those 13 goals can yield benefit in her current educational placement I believe is almost absurd." *Id.* at 1331:2–4.

The only witness who thought I.L. could progress on the 13 goals with only 20 minutes of daily special education was Taylor's expert witness, Dr. Julie Causton, Ph.D. *Id.* Ex. 20. She holds a master's degree and Ph.D in special education, and she is a professor at Syracuse University. She used to be an elementary-school teacher. She has written books and peer-reviewed articles. And she works with schools across the country, teaching them how to implement inclusive schooling for disabled students.

Yet the ALJ put little stock in her expert opinion, not because of her experience but because of how she formed her opinion. To come to her expert opinion, Causton reviewed about 600 pages of school documents like I.L.'s IEPs and notes sent home; Stair's deposition; and a video of I.L. performing activities at home at Taylor's prompting. But she did not observe I.L., nor did she talk to anyone who had worked with or observed I.L.

And unsurprisingly, there were many basic questions that Causton could not answer. She didn't know what kind of training the paraprofessionals had. She didn't know if I.L. had a good relationship with her teacher or paraprofessionals. She didn't know that there were four IEP meetings in

early 2015, and she didn't know that Brickey-McCloud had done a functional behavioral assessment. She said that Barbara Cunningham, I.L.'s regular-class teacher at Brickey-McCloud, did not do a good job of adjusting her lesson plan for I.L. But Causton reached this conclusion after reviewing only one lesson plan, and she did not speak with Cunningham about it.

Most damning, Causton blamed I.L.'s outbursts on the paraprofessionals' lack of training. But this opinion was based only on what Stair said in her deposition, without any inquiry into what training the paraprofessionals actually had. And when Causton was asked how she knew that the lack of training caused I.L.'s outbursts, she explained that, based on her experience, "nine times out of ten" the lack of classroom support is to blame for outbursts. *Id.* at 135:7–8. Causton could not say whether I.L. was within the 9/10 or the 1/10—and this case is about actualities, not probabilities. Because Causton seemed ill prepared and could not answer many basic questions, the ALJ put little weight in her expert opinion. The Court will do so too.

Knox County Schools offered testimony from five knowledgeable people, who all agreed that I.L. could not achieve the 13 goals without more special education. Taylor offered testimony from only one person, and the Court gives that testimony little weight. In deciding whether the District's procedural error denied I.L. a FAPE, the Court must defer to the experts. And the experts say that I.L. would not have received a FAPE under the 13 goals with 20 minutes of special education a day. Brickey-McCloud might have violated the IDEA's procedural requirements. But because that violation did not deny I.L. a FAPE, Taylor cannot recover for it.

### (iv) I.L.'s Teachers Taught to the West Hills IEP, Which Was Not Defective for Lack of Behavioral Supports

Taylor next contends that I.L.'s regular-class teachers failed to teach I.L. according to her IEP. She levels three allegations against Knox County Schools. First, I.L.'s teacher at West Hills did not even know that I.L. had an IEP, much less teach her to it. Second, I.L.'s teacher at Brickey-McCloud failed to teach I.L. to her IEP, instead leaving it to the special-education teacher. Last,

even if these teachers had taught I.L. to her IEP, the IEP was defective for lack of behavioral supports.

None of these allegations stands up to the evidence. Taylor has not proved that I.L.'s teacher at West Hills did not know about I.L.'s IEP. She leans heavily on one passage of testimony from the teacher, Kari Matthews. When asked about 13-goal Brickey-McCloud IEP, Matthews testified,

> A. From Knox County, we didn't have an IEP until this one.
>
> Q. Oh, that's the very first one?
>
> A. For this year in my classroom, that I'm aware of, yes.
>
> . . . .
>
> Q. Right, but there was a previous IEP in place in your class, or is that the very first IEP?
>
> A. First IEP from Knox County.
>
> . . . .
>
> Q. But there wasn't an IEP in place for her until she was transitioned to Brickey. Am I right about that?
>
> A. No, because we were going through the process of getting information for it.

Hr'g Tr. at 1183:9–1184:17. The testimony up until the last question is ambiguous. On the one hand, Matthews seems to be saying that there was no IEP at all until the failed Brickey-McCloud IEP. On the other hand, Matthews seems to be saying that there was no *Knox County* IEP until the Brickey-McCloud IEP. I.L. still had the West Hills IEP, which was basically a modified version of the Virtual Academy IEP from Union County. The testimony to this point may or may not support Taylor's claim.

By contrast, the last question and answer suggest that Matthews did not know about I.L.'s IEP while I.L. was at West Hills. Taken alone, this passage might decide the issue. But it loses force when considered with other parts of Matthews's testimony. Most of all, she also testified,

> Q. Let me ask you differently. Do you understand that I.L. is trying to make pro-gress on her IEP goals?
>
> A. Yes.

Q. Does she have to keep up with the non-disabled peers?

A. No.

Q. So you understand that the curriculum can be modified?

A. Yes.

Q. And in her case, it needs to be modified?

A. Yes. I have a Master's in education curriculum and instruction. I modify students' assignments all the time every day, and sir, plenty of times the modification has to be tailored to that specific student.

*Id.* at 1164:9–21. Here, Matthews seems to be saying that she has modified I.L.'s curriculum in the past so that I.L. could progress on her IEP goals. This suggests that Matthews knew about the West Hills IEP and its six goals.

What's more, Matthews was actually involved in the pre-West Hills IEP meetings. She also took part in the meetings about conducting a functional behavioral assessment on I.L., which can happen only with an IEP. Last, Matthews (after some handholding) testified that she had worked on the six goals while I.L. was in her class. In light of all this testimony, Taylor has not proved by a preponderance of the evidence that Matthews was unaware of the West Hills IEP or failed to teach to it.

Next, Taylor contends that I.L.'s teacher at Brickey-McCloud, Barbara Cunningham, refused to teach I.L. to the West Hills IEP. This argument, however, is built on bizarre cherry-picking of Cunningham's testimony from the due-process hearing. One look at the following passage decides the issue against Taylor:

Q. So she's got your goals in your class and then some special ed goals from the IEP?

A. You know that she has special ed goals from the IEP, and her special ed teacher is the one who tests and reports on that progress.

Q. I'm not trying to be tricky with you, ma'am. I'm trying to figure out how many goals there are.

A. There are six.

Q. And you are not going over those six goals or teaching to those six goals?

A. I teach to those six goals, but I'm not responsible for the progress report.

Q. I thought a minute ago you said they were separate goals and you don't have anything to do with that. Did I misunderstand that?

A. Yes, sir, you did. I teach to those goals when I set forth my lesson plans, but I am not responsible for the progress report.

Q. You are not responsible for filling out the paperwork?

A. Correct.

Q. You are responsible for recognizing her goals in an IEP when she's in the general ed setting, correct?

A. Correct.

Q. And teaching to those goals?

A. Correct.

Q. So it's the paperwork you are not filling out?

A. Correct.

Q. It's being filled out by a special ed teacher?

A. Melissa Halter, her case manager, uh-huh.

*Id.* at 538:5–17. Taylor does not claim that Cunningham had a duty to fill out the paperwork with Halter. Instead, Taylor is arguing that Cunningham did not teach I.L. to her IEP. The testimony says otherwise.

To shore up her argument, Taylor cites 34 C.F.R. § 300.324(a)(3). But this passage is concerned only with the regular-class teacher's participation as a member of the IEP team. It is thus irrelevant.

Finally, the IEP was not defective for lack of behavioral supports. As explained above, school staff had no duty to try every support under the sun before recommending that I.L. receive more special education. *Supra* Subsection VII.C.1.i. And even though they had no such duty, I.L.'s regular-class teachers gave I.L. an extraordinary number of supports and accommodations. There was no procedural violation here.

### (v) Brickey-McCloud Staff Did Not Measure I.L.'s Progress by an Improper Standard

As the final procedural violation, Taylor takes issue with the standard of progress in the Brickey-McCloud IEP. The IEP noted that I.L.'s disability affected "her ability to progress through the general education curriculum with mastery at the same rate as her peers." Hr'g Tr. Ex. 3 at 20. Taylor contends that this was not the appropriate standard to measure I.L.'s progress.

The Court need not decide whether this was an appropriate standard, because I.L. was never held to it. The Brickey-McCloud IEP was never implemented—hence Taylor's claim that staff refused to teach I.L. to the 13 goals—so I.L.'s progress was never measured by the IEP's standard. Even if "mastery at the same rate as her peers" was a too-high standard, it did not result in an IDEA violation.

### 2

Next, Taylor claims that Knox County Schools violated I.L.'s substantive rights under the IDEA. Disabled children have a substantive right to a FAPE in the least-restrictive environment. 20 U.S.C. § 1412(a)(5); *Endrew F.*, 137 S. Ct. at 993. Taylor maintains that the District denied I.L. her right to be educated in the least-restrictive environment.

Knox County Schools did no such thing. Taylor's claim is mostly based on the assumption that the schools should have tried more behavioral supports, provided a consistent paraprofessional, and taught I.L. to the 13 goals.[10] As explained above, none of these amounts to an IDEA violation. *Supra* Subsections VII.C.1.i–iii. But on the other hand, Taylor makes her argument under the framework of *Roncker ex rel. Roncker v. Walter*, 700 F.2d 1058 (6th Cir. 1983). She contends that, under *Roncker*, there is no need to place I.L. in special education at all.

The Court disagrees. Under *Roncker*, I.L. can be removed from the regular class, at least to some extent. At the outset, there is some confusion. In *Roncker*, the Sixth Circuit recognized

---

[10] Taylor also exclaims, "KCS *never* did . . . determine the function behind the behavior (behavior is a form of communication)." [D. 35 at 65]. This is an interesting assertion, because the District conducted a functional behavioral assessment on I.L. and concluded that her behavior was caused by attention seeking. If this is not an effort to determine the function behind I.L.'s behavior, then the Court doesn't know what is.

the possibility that some handicapped children simply must be educated in segregated facilities either because the handicapped child would not benefit from any mainstreaming, because any marginal benefits received from mainstreaming are far outweighed by the benefits gained from services which could not feasibly be provided in the non-segregated setting, or because the handicapped child is a disruptive force in the non-segregated setting.

*Id.* at 1063. Some courts have read this passage as listing factors to decide whether a child can be removed. Others have read it as listing distinct categories. *Compare McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 673 n.4 (6th Cir. 2003) (factors), *and Woods v. Northport Pub. Sch.*, 487 F. App'x 968, 979 (6th Cir. 2012) (citing *McLaughlin*, 320 F.3d at 673 n.4) (same), *with Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 460 (6th Cir. 1993) (categories), *and L.H. v. Hamilton Cty. Dep't of Educ.*, No. 1:14-cv-126, 2016 WL 6581235, at *11 (E.D. Tenn. Nov. 4, 2016) (Collier, J.) (describing *McLaughlin* footnote four as dicta and treating *Roncker* as listing categories). Taylor applies the three *Roncker* considerations as factors and concludes that special education is inappropriate for I.L.

This approach, however, was misguided. Although some courts describe the *Roncker* considerations as factors, those courts either do not apply the factors at all or apply them as categories. *See McLaughlin*, 320 F.3d at 673 n.4 (noting the "inapplicability of any of these three factors"); *Woods*, 487 F. App'x at 979 (noting the factors but not applying them); *Bd. of Educ. of Toledo City Sch. Dist. v. Horen*, No. 3:07CV3631, 2010 WL 3522373, at *20 (N.D. Ohio Sept. 8, 2010) (saying "factors" but applying as categories). So there is actually little support for the *Roncker* considerations as factors.

By contrast, there is support for the considerations as categories. The *Roncker* court described them in "either-or" terms, which strongly suggests that someone can apply one, two, or three of these considerations, but need not apply all three. Antonin Scalia & Bryan A. Garner, Reading Law 116 (2012). But if the considerations were factors, then all three would have to be applied.

The content of the *Roncker* considerations also counsels for them being categories. For instance, if a disabled child would not benefit at all from mainstreaming, then what would be the point of mainstreaming her? The Court will treat the *Roncker* considerations as three separate categories justifying some removal of a disabled child from her regular class.

Under *Roncker*, some removal would be justified for I.L. At the very least, she was a disruptive force in her regular classes. For instance,

- Within her first week at West Hills, I.L. was groping students and staff, pulling hair, spitting on people, and yelling expletives. Hr'g Tr. at 842:11–19.

- In one day, she had over fifty instances of groping and hitting staff members. *Id.* at 216:20–217:10.

- She threw scissors across the room and hit a classmate right above her eye. The classmate's parents then removed her from the class. *Id.* at 220:25–221:15.

- During field day, she pushed down a child who had a degenerative brain disease. *Id.* at 554:24–555:15.

- She picked up a magnet, aimed it at Mathews, and threw it, barely missing. *Id.* at 999:19–8.

- She grabbed Matthews in the groin so hard that Matthews had a bruise. It was so bad that Matthews felt compelled for the first time ever to write up a student. *Id.* at 1110:6–17.

- She pulled a female classmate's hair and made her cry. *Id.* at 568:3–6.

- She spit on classmates and pulled their hair so often that, when she would walk by, they would pull their hoods up. *Id.* at 890:12–17.

- Two children at Brickey-McCloud transferred out of I.L.'s class because of her behavior. *Id.* at 890:24–891:2.

- Some of I.L.'s classmates became so anxious that they had to speak with the school counselor about how to cope. *Id.* at 891:3–9.

- To teach both I.L. and the rest of her students, Matthews needed help from I.L.'s special-education teacher (for more than 20 minutes a day), a paraprofessional, Matthews's administrator, Matthews's coach, the building's coach, the vice principal, and the principal—four

to five adults at a time for a class of twenty students. And even then, Matthews had to devote much more time to I.L. than to other students. *Id.* at 1105:1–1107:2.

• Brickey-McCloud had to hire two paraprofessionals for I.L., because one alone could not handle her. *Id.* at 957:2–17.[11]

I.L. was a constant distraction in class. She posed a danger to herself, her classmates, and staff. She forced parents to pull their children from class. And she made her classmates feel so unsafe that they sought counseling. I.L. was a disruptive force in regular class. Knox County Schools would be justified in removing her from it for some amount of time.

The same result follows from the test set out in *Oberti ex rel. Oberti v. Board of Education of Clementon School District*, 995 F.2d 1204 (3d Cir. 1993), which the ALJ applied in ruling on Taylor's first due-process complaint. It has two prongs. First, the court must determine whether a disabled child can be properly educated without any special education, in a regular class with supplemental aids and services. *Id.* at 1217–18. If not, then the court must determine whether the school has included the child in the regular class to the maximum extent appropriate. *Id.* at 1218.

Under *Oberti*, the recommendations of West Hills and Brickey-McCloud staff were justified. The first prong has three factors: (1) whether staff made reasonable efforts to accommodate I.L. in the regular class; (2) the educational benefits available to I.L. in the regular class with aids and services, as compared to the benefits provided in special education; and (3) the possible negative effects on the nondisabled classmates of including I.L. in the regular class. *Id.* at 1217–18.

On balance, I.L. could not have been properly educated only in the regular class with supplements. As already shown, I.L.'s classmates faced actual, severe effects when she was included in the regular class, let alone possible negative ones. The third factor favors removal.

The first factor does too. Staff made more-than-reasonable efforts to accommodate I.L. in the regular class. At West Hills, I.L. was allowed at least sixty different kinds of modifications to her learning environment, her assignments, and how she was taught. Hr'g Tr. at 869:24–879:21,

---

[11] By listing this misbehavior, the Court does not mean to imply that I.L. is a bad child. By no means. In fact, many witnesses in the due-process hearing went out of their way to note that while I.L.'s behavior is problematic, she is a good-natured, kind-hearted girl. The Court does not doubt this testimony.

1100:16–1107:2, Ex. 59. She was also given a special-education teacher, a paraprofessional, a behavioral liaison, a speech therapist, and a vision therapist. *Id.* at 879:1–9, Ex. 2 at 17. West Hills met its burden. And these supports continued at Brickey-McCloud. *Id.* at 879:13–18. So Brickey-McCloud met its burden too.

Last, I.L. would benefit more from having some special education and supplemented regular education than from having only supplemented regular education. This is largely because the techniques that improve I.L.'s behavior are incompatible with the regular-class environment. I.L. responds well to people who are animated and high energy. But an animated paraprofessional working with I.L. would distract other students in the regular class. And according to I.L.'s behavior intervention plan, the best response when she acts out is to ignore her. Yet if I.L. is making a scene in class, ignoring her until she calms down would take away from the other students' learning time. Likewise, if I.L. is hitting classmates or pulling their hair, then that can't just be ignored. These techniques, however—high energy and ignoring outbursts—can be done in a special-education classroom, which is staffed and equipped to handle behavior exactly like I.L.'s. Under all three *Oberti* factors, Knox County Schools would be justified in giving I.L. some special education.

Taylor resists this conclusion, citing *Oberti* itself. She notes that in *Oberti*, the child had Down syndrome and violent behavioral issues. Still, the Third Circuit upheld the district court's ruling that the school must try more behavioral supports before placing him in special education. Thus, Taylor concludes, Knox County Schools must try more behavioral supports with I.L. before placing her in special education.

This telling of *Oberti* ignores key facts. True, the child in *Oberti* had Down syndrome and a history of violence. 995 F.2d at 1208. And true, the Third Circuit upheld the district court's order for more behavioral supports. *Id.* at 1223. But the child had a history of violence only during kindergarten. *Id.* at 1209. His behavior greatly improved after that. *Id.* at 1209. By the time of the district court's ruling—two years after kindergarten—his behavior was much better. *Id.* at 1222. And true, the district court did find that the child had not been given enough supports in kindergarten. *Id.* at 1221. But the only accommodation he had been given was a modification of his

classroom goals. *Id.* That falls far below what I.L. received. According to *Oberti*, Knox County Schools can remove I.L. from the regular class for some amount of time.

The Court must now consider whether four hours of daily special education would allow I.L. to be in the regular class to the maximum extent appropriate. This would leave I.L. three hours of education a day with her nondisabled peers. Those three hours would be spent in nonacademic classes, like lunch, art, music, and gym. The ALJ ruled that this 3-4 split would allow I.L. to be in the regular class to the maximum extent appropriate.

The Court agrees. "A court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable." *Burilovich*, 208 F.3d at 567. How to divide a disabled child's time between special education and regular education is a matter of educational expertise. So the Court will defer to the ALJ's decision if it was reasonable.

It was. I.L.'s IEP team found that, academically and socially, I.L. performed at pre-K or kindergarten levels. The Brickey-McCloud IEP rated I.L.'s skills no higher than first grade, with most rated pre-K or kindergarten. A psychologist hired as an expert for the due-process hearings confirmed this. Socially and academically, I.L. significantly trailed her peers. A special-education environment would allow I.L. to better learn social and academic skills and make meaningful progress on her IEP goals. Hr'g Tr. at 161:12–23, 162:25–163:12, 197:16–200:23, 222:8–20, 567:15–569:10, 1125:8–1127:14. Plus, I.L. would still get the benefits of being around her nondisabled peers for three hours a day. The 3-4 split proposed in the Brickey-McCloud IEP is reasonable and would provide I.L. a FAPE in the least-restrictive environment.

*Oberti* indirectly supports this conclusion. The *Oberti* test was borrowed largely from the Fifth Circuit decision in *Daniel R.R. v. State Board of Education*, 874 F.2d 1036 (5th Cir. 1989). *See Oberti*, 995 F.2d at 1215. In *Daniel R.R.*, the court noted that the IDEA provides for a continuum of placements. 874 F.2d at 1050. So the court reasoned that schools "must take intermediate steps where appropriate," such as "mainstreaming the child for nonacademic classes only." *Id.* at 1050. The Brickey-McCloud IEP proposes exactly that. It is thus an intermediate step based in sound data and educational expertise. The Brickey-McCloud IEP presents no substantive IDEA violation.

Taylor counters that, because I.L. was never actually placed in special education, Knox County Schools could not have an informed belief that she would benefit from special education. The District is only assuming that I.L. would benefit. And children cannot be placed in special education based on assumptions. Thus, Knox County Schools is violating the IDEA.

This argument is based on a faulty assumption. It assumes that since I.L. has never been in special education, the District could have no basis for recommending it. In fact, the District had a well-informed basis. The recommendation was based on extensive data collection to figure out the root of I.L.'s behavioral problems and possible solutions. And it was based on the schools' knowledge of what special education offers. Under *Ronker* and *Oberti*, Knox County Schools committed no substantive IDEA violation.

**3**

Finally, Taylor contends that Knox County Schools violated the Special Education Behavioral Supports Act when it fenced I.L. with the gym mat. While this is a state-law claim, the Supports Act is incorporated into the IDEA, and Taylor brings this claim under the IDEA. *Supra* Subsection II.B.2.ii. The Court will thus consider Taylor's Supports Act claim as alleging an IDEA violation.

The Supports Act imposes specific rules about when a disabled student may be restrained or isolated by school staff. TENN. CODE ANN. § 49-10-1304. Taylor says that Brickey-McCloud staff broke these rules at the beginning of I.L.'s fourth-grade year when it fenced her with the blue gym mat. The District counters that the fencing was merely a time-out, not a restraint or isolation. The District also maintains that expert testimony is needed to define *restraint* and *isolation*. Finally, it argues, there are questions of fact that warrant a hearing before deciding whether staff violated the Supports Act.

Knox County Schools violated the Supports Act. To answer this question, the Court will not seek expert testimony. Four reasons support this decision. First, the Act suggests that expert, scientific definitions would be inappropriate. The Act allows school staff to restrain or isolate a disabled student under certain conditions. Most staff, however, are not experts in special education.

So were the Act interpreted according to experts, most staff would have trouble understanding what they could do. The Court is hesitant to interpret the Supports Act in a way that would make it harder to follow.

Second, Federal Rule of Evidence 702 counsels against using expert testimony in this way. Expert testimony can be used if it would "help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). Statutory interpretation, however, is a legal issue, not a factual one. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994); *see also Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) (collecting cases rejecting expert testimony for statutory interpretation). It thus has no place in interpreting the Act.

Third, if expert testimony had a place in statutory interpretation, then that would be reflected in appellate standards of review. In Tennessee, what a statute means is a question of law, reviewed on appeal with no deference to the lower court. *Mansell v. Bridgestone Firestone N. Am. Tire*, 417 S.W.3d 393, 400 (Tenn. 2013). "When it comes to live, in-court witnesses," by contrast, "appellate courts should afford trial courts considerable deference when reviewing issues that hinge on witnesses' credibility because trial courts are uniquely positioned to observe the demeanor and conduct of witnesses." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014). So if statutory interpretation hinged on expert-witness credibility, then appellate review of that interpretation would require some deference. But there is none.

As for evidence that is not live testimony, "an appellate court's ability to assess credibility and to weigh the evidence is the same as the trial court's." *Id.* at 693. Hence "an appellate court may draw its own conclusions with regard to the weight and credibility to be afforded that documentary evidence." *Id.* This is similar to the use of dictionaries, secondary sources, and other extrinsic aids in statutory interpretation. There is a difference between an aid—which any court can have full access to—and a live expert witness, whose testimony is fully accessible only to the judge who hears it. So while it may be fine to use extrinsic aids in statutory interpretation, it is not appropriate to use expert testimony.

Finally, at bottom, it is the judge alone who is tasked with saying what the law means. To consider expert testimony would be to improperly delegate that duty. *See, e.g.*, *United States v. Edge*, 989 F.2d 871, 879–80 (6th Cir. 1993) (Suhrheinrich, J., concurring); *see also Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 601 (Tenn. Ct. App. 1999). For these reasons, the Court will not look at expert testimony to interpret the Supports Act.

So it is up to the Court alone to interpret *restraint*, *isolation*, and *time-out*. The Supports Act does not define *restraint*. It does, however, define terms using *restraint*:

> (2) "Chemical restraint" means a medication that is prescribed to restrict a student's freedom of movement for the control of extreme violent physical behavior. . . .

> (6) "Mechanical restraint" means the application of a mechanical device, material or equipment attached or adjacent to the student's body, including ambulatory restraints, which the student cannot easily remove and that restrict freedom of movement or normal access to the student's body. . . .

> (8) "Physical holding restraint" means the use of body contact by school personnel with a student to restrict freedom of movement or normal access to the student's body.

TENN. CODE ANN. § 49-10-1303(2), (6), (8). These definitions have three things in common: the use of *restraint*, a direct contact with the student's body, and the purpose of restricting a student's freedom of movement. *Restraint*, then, means using direct physical contact for the purpose of restricting a student's freedom of movement.

Under this definition, the gym-mat fencings were not restraints. The parties agree that, while I.L. was fenced, the mat did not touch her. So if Brickey-McCloud staff violated the Supports Act, it was not through restraint.

Brickey-McCloud staff did, however, violate the Act through isolation. *Isolation*

(A) Means the confinement of a student alone in a room with or without a door, or other enclosed area or structure pursuant to § 49-10-1305(g) where the student is physically prevented from leaving; and

(B) Does not include time-out, a behavior management procedure in which the opportunity for positive reinforcement is withheld, contingent upon the demonstration of undesired behavior; provided, that time-out may involve the voluntary separation of an individual student from others.

TENN. CODE ANN. § 49-10-1303(4). No one claims that I.L. was isolated in a room, and all agree that she was confined. So there are two issues here: (1) whether the gym-mat ring was an enclosed are or a structure; and (2) if either, whether the fencings were a time-out.

The fence was an enclosed area, and the fencings were not a time-out. The Supports Act does not define *enclosed area*. Hints can be found, however, in other Tennessee statutes. For instance, Tennessee has the Non-Smoker Protection Act. *Id.* §§ 39-17-1801 to -1812. Its purpose is to protect nonsmokers. And it defines *enclosed area* as "all space between a floor and ceiling that is enclosed on all sides by solid walls or windows, exclusive of doorways, that extend from the floor to the ceiling." *Id.* § 39-17-1802(5). Similarly, the Supports Act's purpose is to protect disabled students. *See id.* § 49-10-1302(4). So by extension, *enclosed area* in the Supports Act could be defined by the definition in the Non-Smoker Protection Act. *See Pickard v. Tenn. Water Quality Control Bd.*, 424 S.W.3d 511, 520 (Tenn. 2013).

But this would create a redundancy: *isolation* means confinement in a "room . . . or other enclosed area or structure." TENN. CODE ANN. § 49-10-1303(4)(A). An area with a floor, ceiling, and floor-to-ceiling walls is simply a room. Statutes must be interpreted to avoid redundancies. *See, e.g.*, *Womack v. Corr. Corp. of Am.*, 448 S.W.3d 362, 373 (Tenn. 2014). This definition of *enclosed area* must therefore be adjusted.

The question is how to adjust it. This definition of *enclosed area* has three elements: floor, ceiling, and floor-to-ceiling walls (or windows). "Floor" can be dropped from the definition. After all, without a floor there is nothing keeping people on the ground—the existence of a floor is a

given. And a ceiling is not necessary for an enclosed area. "Ceiling" can thus be dropped from the definition of *enclosed area*. But then "floor-to-ceiling" walls would make no sense. So the "floor-to-ceiling" qualifier must be dropped too. Instead, the enclosed area must have some walls, regardless of how tall. Indeed, many Tennessee regulations refer to enclosed areas that have short wall-type barriers. *See* Tenn. Comp. R. & Regs. 0145-03-.02(2)(a) (fighting rings), 0400-45-09-.01 (animal pens), 0400-48-01-.15(5)(f)(7) (sewage lagoon areas), 0520-12-01-.12(10)(b) (outdoor play areas), 1240-04-03-.12(9)(b) (same). So *enclosed area* means a space with vertical barriers meant to keep someone inside or outside the area.

This definition finds support in the word *enclosed*, which could be rewritten as *closed-in*. It also finds support in § 49-10-1305(g), which defines the required features of any "space" used as an isolation room. For example, an isolation room must be temperature controlled, comfortably lit, and incapable of being locked. Tenn. Code Ann. § 49-10-1305(1), (3), (4). Any area with wall-type barriers can meet these qualities, and the others in § 49-10-1305(g).[12] As long as the space has vertical barriers, it's an enclosed area. And as long as the enclosed area conforms to § 49-10-1305(g), the area does not violate the Supports Act.

Under this definition, the gym-mat fence was an enclosed area. The gym mat and walls acted as the barriers keeping I.L. in. Because the gym-mat fence was an enclosed area, the Court need not consider whether it was a structure. Instead, what matters now is whether the fencing was an isolation or a time-out.

It was an isolation. To reach this conclusion, it must be defined in relation to *time-out*. Tenn. Code Ann. § 49-10-1303(4). And it must be defined in relation to the Supports Act as a whole. *Arden v. Kozawa*, 466 S.W.3d 758, 764 (Tenn. 2015). A purpose of the Supports Act is to "promote positive behavioral supports that reduce dependence on isolation and restraint practices." Tenn. Code Ann. § 49-10-1302(3). A positive behavioral support is a proactive, positive instructional approach to prevent and respond to problem behavior. *Id.* § 49-10-1303(9)(A). Opposite proactive,

---

[12] An outdoor enclosed area could still be temperature controlled, assuming that the weather were predictable and the temperature were not too high or low.

positive measures are reactive, positive ones. A reactive, positive measures is time-out, which the Supports Act defines as "a behavior management procedure in which the opportunity for positive reinforcement is withheld, contingent upon the demonstration of undesired behavior." *Id.* § 49-10-1303(4)(B).

That leaves isolations. They are not proactive, as isolations are used only when an emergency situation is already happening. *Id.* § 49-10-1304(a). But neither can isolations be a negative behavioral measure. Time-outs are reactive and positive, so isolations would have to be reactive and negative. But a reactive, negative measure is punishment—a purpose that the Supports Act bans for isolations. *Id.* § 49-10-1305(e)(1). So isolations are neither proactive nor reactive measures to alter to a student's behavior. The only conclusion, then, is that isolations (and restraints) are not meant to alter a student's behavior.

If staff are isolating a student during an outburst, there are two possible reasons: to alter the student's behavior, or to protect the student and others from her behavior. Isolations are not meant to alter behavior. Thus, the only purpose an isolation can serve is to protect the student and others.

Under this, definition, I.L. was isolated. She was contained in an enclosed area. And I.L. was placed in that enclosed area to protect her and others from her outbursts. Audio file: IEP Meeting (Aug. 18, 2015), at 14:45–14:56, 15:30–15:40, 17:15–17:25, 19:20–21:07, 47:50–48:00, 1:30:50–1:31:25 (on file with Court). The last issue is whether these isolations violated the Supports Act.

They did. Taylor was not notified on the same day that the isolations occurred. TENN. CODE ANN. § 49-10-1304(d)(1). And the gym-mat fence was 16 square feet, far from the minimum of 40. TENN. CODE ANN. § 49-10-1305(g)(6). Finally, as Knox County Schools admitted, it isolated I.L. 21 times over three days, for a total of four hours. 2d Due Process Compl. Tech. R. Resp. to Pet'rs First Set of Interrogs. at 2 [hereinafter Resp.].[13] Knox County Schools wrongly isolated I.L. for four hours, in violation of the Supports Act.

---

[13] The school district states that "it was not been [sic] established how often the blue gym mat was used to protect staff from I.L. during those time outs." [D. 54 at 55 n.18]. Yet the interrogatory asks, "For each occasion that I.L. was placed in [the gym-mat fence], please state the total number of minutes." Resp. at 1. Knox County Schools responded with a list containing the dates, times, and lengths of each isolation, which total four hours. And the District offers no evidence to counter its own admission. So it has been established how long the mat was used during the isolations.

The District clamors that I.L. was not isolated because she was always within eyesight of staff. But the Supports Act requires that all isolations occur "where school personnel are in continuous direct visual contact with the student at all times." TENN. CODE ANN. § 49-10-1305(g)(5) (cleaned up). The District also claims that isolations require a locked room. Yet under the Act, all isolations must happen in a space that is "unlocked and incapable of being locked." *Id.* § 49-10-1305(g)(1) (cleaned up). The District's counterarguments ignore the Act's plain text. Knox County Schools violated the Supports Act by wrongly isolating I.L. for four hours over four days at Brickey-McCloud Elementary School. By doing so, it violated the IDEA.

## D

As in the due-process hearings, Knox County Schools comes out on top on the IDEA claims, and Taylor comes out on top on the IDEA–Supports Act claim. Now the Court must determine the proper remedies. The Court must grant whatever relief it "determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). The Court has broad discretion at this point, although the remedies must be appropriate in light of the IDEA's purpose of providing disabled children with a FAPE. *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).

These are the general considerations that the Court must keep in mind. But there are also considerations specific to this suit. First, the Brickey-McCloud IEP, with its 13 goals and 3-4 split, is more likely to provide I.L. a FAPE in the least-restrictive environment than the West Hills IEP is. Second, I.L.'s behavior intervention plan will help with her behavioral issues. Third, the gym-mat isolations deprived I.L. of four hours' education. And while those four hours were spread over four days, that does not mean that I.L. received no education at all over those four days. Last, Kelton Sweet came up with the gym-mat isolations. But although the isolations were wrong, there is no evidence that Sweet isolated I.L. out of ill will. Far from it. The evidence shows that the efforts of Sweet—a nonlawyer—were meant only to help I.L. do her best under the bounds of the West Hills

The District also asserts that the isolation length covers the whole time I.L. was out of class, not just the time spent in isolation while she was out of class. But again, it offers no evidence to support this assertion. The record indicates only one thing: I.L. was in the gym-mat ring for a total of four hours.

IEP. Indeed, he conducted the functional behavioral assessment that led to I.L.'s behavior intervention plan. So there is no reason to ban Sweet from interacting with I.L.

With all this in mind, the Court orders as follows:

1. the Brickey-McCloud IEP must be implemented at the start of the 2017–2018 school year;

2. I.L.'s behavior intervention plan must be implemented as soon as possible;

3. I.L. must not be isolated unless expressly allowed by her IEP or by Taylor's consent; and

4. Knox County Schools must provide I.L. with four hours' makeup education over the 2017–2018 school year, and the District must decide how those four hours will be spread out.

## VIII

The Department of Education has also moved to stay this case so the Court can address the pending motions. But because all the motions are now being addressed, there is no need to do so. The Department's motion will be denied as moot.

## IX

Finally, Defendants ask the Court to move back trial, currently set for August 22, 2017. They request a continuance because of scheduling conflicts with other trials. The District's lawyers have a trial on August 8 in the Middle District of Tennessee, and the Department's lawyers have a trial on August 14 in state court. Taylor argues that the trial date was set over a year ago and that a later trial date would run over into the 2017–2018 school year. She also maintains that the other trials should be rescheduled, not this one.

The Court finds Defendants' motion well taken. Because of all the moving pieces that need to be in place for a trial, "broad discretion must be granted trial courts on matters of continuances." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). The Court cannot reasonably expect Defendants' lawyers to prepare for those trials and this one. And the Department was not even a party in this suit when the trial date was set. Last, Knox County students start school on August 7, 2017. Knox County

Schools, *2017–2018 Knox County Schools Calendar* (Apr. 5, 2017), goo.gl/Kyi3kk. So an August 22 trial would already cut well into the start of school. Defendants' motion will be granted.

# X

The Court has addressed ten motions, all of which center on one issue: What is best for I.L. The law says that what is best is a free appropriate public education in the least-restrictive environment. The parties agree that this is best. But they disagree on how to carry that out. On one side is Donna Taylor, I.L.'s mother. She has spent years fighting for her belief that I.L. would be best served by spending nearly all her school time in the regular class. And because Taylor knows this is what I.L. needs, it is what I.L. has received, one way or another. "To know what will come is the same as to make it so." CORMAC MCCARTHY, SUTTREE 423 (Vintage Books 1992) (1979). So I.L. has received almost no special education.

On the other side is Knox County Schools, which thinks that more special education is exactly what I.L. needs. Staff pushed to make that a reality. Taylor resisted. This resistance led to legal action. And when the legal action tied the schools' hands, they tried to do their best for I.L. under the circumstances. Staff tried certain techniques to balance I.L.'s right to a mainstream education with her peers' right to a safe education. Some of these techniques worked, but most didn't. Then one of these techniques went too far, and violated state law.

Both sides are convinced that they have only done right by I.L. But in a situation this fraught, it is unsurprising that neither side is blameless. All want what is best for I.L.—Taylor, Knox County Schools, and the Tennessee Department of Education. And after years of litigation, it has been left to the Court to decide what is best. So the Court orders as follows:

1. the Department of Education's motion to dismiss [D. 28] is **GRANTED** on Plaintiffs' procedural-safeguard claim and **DENIED** on all others;

2. the Department's motion for summary judgment [D. 85] is **GRANTED**;

3. Plaintiffs' motion for partial summary judgment [D. 62] is **DENIED**;

4. the Department's countermotion for summary judgment [D. 84] is **DENIED as moot**;

5. Plaintiffs' motion to admit the Department's answer to an interrogatory [D. 49] is **DENIED**;

6. the District's motion to strike the Department's answer [D. 50] is **DENIED as moot**;

7. the motions for judgment on the administrative record [D. 35, 54] are granted in favor of Knox County Schools on the IDEA claims and in favor of Taylor on the IDEA–Supports Act claim, and the following remedies are ordered:

    a. the Brickey-McCloud IEP must be implemented at the start of the 2017–2018 school year;

    b. I.L.'s behavior intervention plan must be implemented as soon as possible;

    c. I.L. must not be isolated unless expressly allowed by her IEP or by Taylor's consent; and

    d. Knox County Schools must provide I.L. with four hours' makeup education over the 2017–2018 school year, and the District must decide how those four hours will be spread out;

8. the Department's motion to stay [D. 75] is **DENIED as moot**; and

9. Defendants' motion to continue trial [D. 76] is **GRANTED**.

Taylor's claims against the Department of Education are **DISMISSED with prejudice**. All that remains of this suit are Taylor's claims against Knox County Schools for retaliation, negligence, gross negligence, negligence per se, and false imprisonment.[14] Counsel for Taylor and Knox County Schools are **ORDERED** to appear before the Court for a case-management conference on **June 28, 2017, at 1:30 p.m.** Counsel for the Department of Education need not attend the conference.

  **IT IS SO ORDERED.**

_____
**UNITED STATES DISTRICT JUDGE**

---

[14] The Court takes no position on these claims.